No. 36,418

AETNA INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance of the State of Kansas, *Defendant*.

No. 36,421

THE CENTURY INDEMNITY COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,422

CENTRAL LIFE ASSURANCE SOCIETY (Mutual), *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,423

TRINITY UNIVERSAL INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,424

SECURITY NATIONAL FIRE INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,425

BANKERS LIFE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,426

NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,427

STANDARD ACCIDENT INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,428

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, *Plaintiff*, *v.* CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,429

EQUITABLE LIFE INSURANCE COMPANY OF IOWA, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,445

PACIFIC MUTUAL LIFE INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,448

AMERICAN INDEMNITY COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,449

THE COLUMBIAN NATIONAL LIFE INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc.; *Defendant*.

No. 36,466

EMPLOYERS CASUALTY COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,478

NATIONAL LIFE INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

No. 36,491

COMMERCIAL STANDARD INSURANCE COMPANY, *Plaintiff*, v. CHARLES F. HOBBS, as Commissioner of Insurance, etc., *Defendant*.

(161 P. 2d 726)

Opinion filed September 15, 1945.

*George M. Brewster,* of Topeka, argued the cause, and *John L. Hunt, Lester M. Goodell,* and *Margaret McGurnaghan,* all of Topeka, were on the briefs for plaintiffs Aetna Insurance Company, The Century Indemnity Company, American Indemnity Company, and Commercial Standard Insurance Company.

*Robert Stone,* of Topeka, argued the cause, and *James A. McClure, Robert L. Webb, Beryl R. Johnson,* and *Ralph W. Oman,* all of Topeka, were on the briefs for plaintiffs Central Life Assurance Society (Mutual), Trinity Universal Insurance Company, Security National Fire Insurance Company, Bankers Life Company, National Life and Accident Insurance Company, Standard Accident Insurance Company, Pacific Mutual Life Insurance Company, The Columbian National Life Insurance Company, and The National Life Insurance Company.

*J. P. Lorentzen,* of Des Moines, Iowa, was on the briefs for the Bankers Life Company, and *Leslie J. Cooper,* of Los Angeles, Cal., was on the briefs for the Pacific Mutual Life Insurance Company.

*W. E. Stanley,* of Wichita, argued the cause, and *Claude I. Depew, Lawrence Weigand,* and *William C. Hook,* all of Wichita, were on the briefs for plaintiffs Prudential Insurance Company of America and Equitable Life Insurance Company of Iowa.

*M. F. Cosgrove, Clayton E. Kline, Balfour S. Jeffrey,* and *Robert E. Russell,* all of Topeka, were on the briefs for plaintiff Employers Casualty Company.

*A. B. Mitchell,* attorney general, and *Harry W. Colmery,* of Topeka, argued the cause, and *L. P. Brooks, C. H. Hobart,* assistants attorney general, *Irwin Snattinger* and *Peter F. Caldwell,* both of Topeka, were on the briefs for defendant Charles F. Hobbs, as Commissioner of Insurance of the State of Kansas, in each of the cases.

*C. W. Burch, B. I. Litowich, LaRue Royce, E. S. Hampton,* and *H. H. Dunham, Jr.,* all of Salina, as *amici curiae.*

The opinion of the court was delivered by

HARVEY, C. J.: Each of sixteen insurance companies, incorporated under the laws of a state other than Kansas and previously admitted to do business in this state, brought mandamus proceedings in this court seeking an order compelling the commissioner of insurance of this state to issue to them respectively a certificate of authority to do business in this state during 1945 without payment on their part of the premium taxes on their 1944 business (and some of them without payment of the license fees for their agents), which payments our statutes (G. S. 1935, 40-252 B, 40-253) require as conditions precedent to the issuance of such certificates; and in addition thereto the fire insurance companies seek such certificates without the payment of the fircmen's relief-fund tax which our statutes (G. S. 1935, 40-1701 and G. S. 1943 Supp. 40-1702, 40-1703) require as a condition precedent to the issuance of such certificates. Other insurance companies similarly situated have intervened. Only three of the cases, Nos. 36,428, 36,445 and 36,448, are fully abstracted. The other plaintiffs and the intervenors have stipulated to abide the result in some one of the three cases. (See Note 1 for more detailed statement.)

Plaintiffs contend that our statutes above cited, though previously regarded as valid and complied with by plaintiffs, were rendered void by the decision of the Supreme Court of the United States, June 5, 1944, in *U. S. v. Underwriters Assn.,* 322 U. S. 533, 64 Sup.

Ct. 1162, 88 L. Ed. 1440. They further contend that by Public Law No. 15 of the 79th Congress, first session (set out in Note 2), congress exceeded its powers, and that in any event the law has no effect upon the questions here involved.

Shortly stated, our statute (G. S. 1935, 40-252 B) provides that insurance companies organized under the laws of any other state, territory or country shall pay the following annual fees: For filing annual statement, $50; for state school fund, $50; for renewal of certificate of authority, $1, and $2 for each agent's license issued or renewed, and in addition thereto shall pay a tax upon all premiums received during the preceding year at the rate of two per cent; and G. S. 1935, 40-253, provides that when the laws of a state under which the insurance company was incorporated require the payment of greater taxes, etc., from insurance companies of other states than is required by the existing laws of this state, then such companies shall pay the taxes, etc., which would be required by a company organized in this state in order to do business in such other state. These provisions were first put into our law in 1871 (Laws 1871, ch. 93, § 17) and with slight amendments, not necessary to note, have continued to be a part of the laws of this state. That portion of the law of 1871 which is now G. S. 1935, 40-253, was attacked in the case of *Phoenix Ins. Co. v. Welch*, 29 Kan. 672 (opinion by Brewer, J.), as being unconstitutional upon the grounds, (1) that its validity depends upon the legislation of some other state, and (2) that it conflicts with section 1 of article 11 of our constitution relating to equality of taxation. The court held the legislature has authority to pass a law the operation of which is by its terms made to depend upon a contingency, even though that contingency be some action of the legislature of another state; and further held that the fees and charges required by the statute are in the nature of licenses, and as such are not subject to the constitutional provision of equality of taxation. On the first point the decision was cited and followed in *City of Pittsburg v. Robb*, 143 Kan. 1, 53 P. 2d 203, where one of our statutes was made contingent upon an act of congress. In the opinion (29 Kan. 674-5) the court took note of the fact that the provision in question is referred to in insurance circles as "a retaliatory" clause, and said:

"It seems to us more justly to be deemed a provision for reciprocity. It says, in effect, that while we welcome all insurance corporations of other states to the transaction of business within our limits, we insist upon a like welcome

elsewhere, and that if other states shall attempt, directly or indirectly, to debar our corporations from the transaction of insurance business within their borders, we shall meet their corporations with the same restrictions and disability. It is, in brief, an appeal for comity; a demand for equality. As such, it is manifestly fair and just. It arouses no sense of injustice, and simply says to every other state in the Union: 'We will meet you on the basis of equality and comity, and will treat you as you treat us.' "

This decision has stood throughout the years. Our later cases dealing with this statute have involved its application to the facts involved or to methods of computation of the tax. (*State, ex rel., v. Wilson,* 102 Kan. 752, 172 Pac. 41; *Employers Casualty Co. v. Hobbs,* 149 Kan. 774, 89 P. 2d 923; *Pacific Mutual Life Ins. Co. v. Hobbs,* 152 Kan. 230, 103 P. 2d 854; *Employers Casualty Co. v. Hobbs,* 152 Kan. 815, 107 P. 2d 715; *Equitable Life Assurance Society v. Hobbs,* 154 Kan. 1, 114 P. 2d 871; *Equitable Life Assurance Society v. Hobbs,* 155 Kan. 534, 127 P. 2d 477, and *State, ex rel., v. Hobbs,* 158 Kan. 320, 147 P. 2d 721.) In some of these cases the court had occasion to quote from *Phoenix Ins. Co. v. Welch,* supra, and reaffirmed the purpose and validity of the statute.

These fees and taxes were used only to support the insurance department (Laws 1871, ch. 93, § 17), but that was soon changed (Laws 1875, ch. 112, § 3), and now they are turned into the state's general revenue fund. The insurance department is maintained by appropriation from the general fund. The amount has increased irregularly from less than $6,000 for 1871 to $1,480,884.68 in 1943 (74th Annual Report of the Commissioner of Insurance, p. 19), of which amount $1,210,709.17 was premium taxes. For many years these receipts have been and still are a substantial source of income for the conduct of the state's business. Most other states have similar laws, some older than ours, and have used the fees and taxes collected much as we have used those collected in this state. Under these statutes the gross premium taxes on insurance companies yielded to the states approximately $123,000,000 in 1943 (State Tax Collection of 1943, published by Bureau of Census). These state laws for the collection of fees and taxes from insurance companies consistently have been held valid by the state and federal courts for almost one hundred years. This is conceded by plaintffs. The validity of none of them was specifically involved or held invalid by the Supreme Court in *U. S. v. Underwriters Assn.,* supra.

Our firemen's relief-fund statute was first enacted in 1895 (Laws

1895, ch. 363), embodied in our insurance code of 1927 (Laws 1927, ch. 231), and amended in 1941 (Laws 1941, ch. 257), and appears now as G. S. 1935, 40-1701 and G. S. 1943 Supp. 40-1702 to 40-1707. Shortly stated, it requires fire insurance companies organized under the laws of any other state or country authorized to do business in this state and doing business in an incorporated city or township maintaining a fire department to pay an annual tax of $2 upon $100 of its premiums to be used for a disability and pension fund for firemen disabled in the performance of their duties. Its purpose was to aid municipalities in providing a more stable and experienced personnel for their fire departments, and thus lessen the loss from fire in congested areas. This plan of increasing the efficiency of the fire departments of municipalities has proved effective and beneficial to insurers. Its validity has never heretofore been questioned. The amount of tax collected under these statutes during the year 1943 was $94,592.34. This was disbursed by defendant to the municipalities where it had been collected. (74th Annual Report of Commissioner of Insurance, pp. 15-17.)

The principal contention of counsel for plaintiffs is that the effect of the decision in the case of *U. S. v. Underwriters Assn.*, supra, is to render void all of our statutes involved herein prescribing fees and taxes to be paid by foreign insurance companies. While differently worded in the briefs, it is succinctly stated in the brief in case No. 36,445, where, after referring to our statutes and similar statutes of other states and decisions of courts thereon, it is said:

"The list of state and Federal cases sustaining the state in the exercise of these powers is long and almost unbroken. All that line of decisions is now obsolete. It is past history. It need not be hashed over. It is now settled beyond further argument that the insurance business is commerce and if conducted in two or more states by a company, that company is engaged in interstate commerce."

We think the point is not well taken. The opinion of the court upon which plaintiffs rely does not sustain that view. It specifically refers to the contention sometimes made that if any aspect of the business of insurance be treated as interstate commerce, then all control over it is taken from the states and the legislative regulations which this court has heretofore sustained must be declared invalid, and says: "Accepted without qualification, that broad statement is inconsistent with many decisions of this court," citing *Crutcher v. Kentucky*, 141 U. S. 47, 11 S. Ct. 851, 35 L. Ed. 649; *Atlantic Refining Co. v. Virginia*, 302 U. S. 22, 58 S. Ct. 75, 82 L. Ed.

24; and *McGoldrick v. Berwind-White Co.*, 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, which cases cite many other authorities to the same effect.

The opinion continues:

"It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. . . . In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accomodated (citing authorities). And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid." (Citing authorities.) (p. 548.)

And later in the opinion it was said:

"The argument that the Sherman Act necessarily invalidates many state laws regulating insurance we regard as exaggerated." (p. 562.)

We note, also, that the court did not overrule *Paul v. Virginia*, 8 Wall. 168, 19 L. Ed. 357, and other cases commented upon in the opinion or cited in the note thereto, which sustained state statutes regulating or taxing insurance companies. The court criticized a reason given by the court (in some instances, at least, not necessary to the decision) to the effect that insurance is not commerce, and it specifically distinguished those cases from the case then before the court.

The court pointed out that none of those cases "involved an act of congress which required the court to decide the issue whether the commerce clause grants to congress the power to regulate insurance transactions stretching across state lines," and said: "Today for the first time in the history of the court that issue is squarely presented and must be decided."

We have no adverse criticism of the opinion of the court in *U. S. v. Underwriters Assn.*, supra; we seek only to understand it. We have no difficulty in understanding it unless we center our minds upon inferences possible to be drawn from the decision rather than upon the decision itself. We think counsel for plaintiffs have predicated these actions upon the inference they have drawn from the opinion that the court, having held insurance is commerce, it necessarily follows that our state laws in question are invalid. As we

have seen, the court in its opinion specifically negatived that view. It did not pass upon the validity of any state law regulating or taxing insurance companies.

In the opinion in *U. S. v. Underwriters Assn.*, supra, it was said the record before the court "presents two questions *and no others:* (1) Was the Sherman Act intended to prohibit conduct of fire insurance companies which restrains or monopolizes the interstate fire insurance trade? (2) If so, do fire *insurance transactions which stretch across state lines* constitute 'Commerce among the several States' so as to make them subject to regulation by Congress under the Commerce Clause?" (Italics supplied.) · We are not concerned with the first of these questions, but note that it appears to have been the one upon which the members of the court were divided. We emphasize two phrases in the above quotation, for they seem to make it clear that the court limited the matters determined by its opinion to two, and that the second one was further limited to *"insurance transactions which stretch across state lines."* In short, the court· was not attempting to determine anything with reference to the regulation or taxation of insurance companies by a state. Neither was it attempting to decide anything about the business of insurance conducted within a state. Plaintiffs stress the language of the opinion respecting local transactions as being part "of a chain of events." This was used in describing the charge of the indictment; and further to point out that if so, that would not destroy the interstate character of the business then being considered by the court. We find no justification for plaintiffs' conclusions to the effect that the court held all of the local business of insurance, considered alone, to be interstate business. No such claim had been made by the defendant in the court below. "There was not even a demurrer on that ground." The trial court treated all of the business of insurance as not being commerce and concluded that transactions across state lines could not be interstate commerce. The supreme court, reversing that decision, limited the question upon which it passed to "insurance transactions which stretch across state lines." As hereinbefore pointed out, the court regarded it as settled that "for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation." The opinion of the court dealt only with the interstate character of the business.

The insurance business, considered as a whole, fits itself into the last quotation made. The agreed facts in these cases clearly demonstrate this. Each company is organized in some state other than Kansas, where it has its general officers, who outline the plan for conducting the company's business, appoint agents and other representatives, who make reports to the head office. These are "insurance transactions which stretch across state lines" and constitute activities among the states subject to federal regulation. The agreed facts show many other transactions of the insurance business transacted within the state properly classified as intrastate in character and subject to state control. We shall not repeat these at length here since they are embodied in detail in the agreed facts. It is sufficient here to say that in the fire, indemnity, casualty and suretyship lines of insurance the insurance is not only solicited by agents in the state, but that the policies are actually written up, executed and delivered in this state both upon written and oral applications, and in some instances the agents are authorized to make oral agreements of insurance binding upon their respective companies. In life and other forms of insurance made only upon written application—usually but not always with medical examination, and where plaintiffs at the home offices check those applications and medical examinations and approve them and prepare and sign insurance contracts—the same are not effective until actually delivered in Kansas by an agent of the insurer to the insured who has paid the first premium and who is then in good health. More than that, the agents in Kansas service the various types of policies, advise the insured as to his rights thereunder, accept for the insured claims or proofs of loss, which claims are settled by Kansas representatives of the insurer. Plaintiffs seek certificates of authority to do business in this state. Under such certificates, previously granted, plaintiffs have appointed many agents in this state, in some instances with state and district offices, and over the years have built up a large and prosperous business within the state of Kansas. This is the type of business for which they seek a state certificate of authority. It is alleged in one of the petitions that the business of insurance is highly competitive. The competition is in the getting of the business. The financial purpose involved is to get premiums, which are the basic source of plaintiffs' income. Without the intrastate activities of plaintiffs and the premiums arising therefrom their interstate business would be nominal. Plaintiffs are not seeking to do only an

interstate business, and if so, perhaps they would not need any cer-
tificate of authority from this state. Plaintiffs are not content to
confine their business to transactions which move across state lines;
they desire to enter the highly competitive field of writing insurance
in this state, the field from which the money comes which is the
original and principal source of plaintiffs' income.

When each of the plaintiffs was admitted to do business in this
state it either specifically or in legal effect agreed to be bound by
the laws of the state respecting its business. All of the time each
of the plaintiffs has transacted business in Kansas the state has had
in effect a number of laws regulating and taxing insurance com-
panies, which have been modified from time to time as occasion
seemed to demand. (See G. S. 1935 and G. S. 1943 Supp., ch. 40.)
These statutes cover a wide field and pertain not only to the form
of corporate organizations; to the regulation of their investments
and other matters pertaining to their solvency; the kind and form
of the policies which they may issue; provisions pertaining to the
duties and liabilities of their agents; the settlement and payment
of losses; the provision for their taxation, but generally provide for
the regulation and taxation of insurers transacting a state business
in this state. The fact that the state does these things is strongly
stressed by insurers in selling policies to our citizens and securing
premiums from them.

It is well settled that the insurance business is a quasi-public
business and that it is so impressed with the public interest that a
state, under its police powers and under its general powers to regu-
late corporations generally, both domestic and foreign, in the interest
of the welfare of its citizens may enact and enforce laws of the kind
above referred to. (See 44 C. J. S. 518 and 557; 29 Am. Jur. 59, 70,
and authorities there cited.)

Plaintiffs argue in effect that all of these statutes are rendered
nugatory, or at least they are thrown into such confusion that no
one can tell anything about them, by the decision of the Supreme
Court in *U. S. v. Underwriters Assn.*, supra. We cannot sustain that
view. As previously pointed out, the court, in the opinion relied
upon, clearly stated the specific questions, and the only questions
presented by the record in the case before it. Plaintiffs do not con-
tend that the specific questions stated in the court's opinion, and
decided by it, name state statutes such as ours as being void, but
argue that the invalidity of our state statutes follows as a necessary

result of what the court decided. This point is not well taken. It is our view that if and when the Supreme Court of the United States deems it is justified upon the record before it to hold that all the state regulatory and taxing statutes pertaining to insurance companies are invalid it will do so, not by implication only but in language so clear that inferences will not have to be relied upon to determine its meaning, and in a case in which the validity of such a state statute is involved.

Since plaintiffs predicate these proceedings upon their view that the inferences to be derived from the decision of the Supreme Court in *U. S. v. Underwriters Assn.*, supra, and since we do not sustain their view that such inferences render our statutes void, the basic premise upon which they rely fails.

Plaintiffs argue that the taxes required by our state statutes in question impose a direct burden upon plaintiffs' interstate business in violation of the commerce clause (art. 1, § 8, clause 3) of the United States Constitution. We think the following analysis will make it clear that the point is not well taken: (1) While the taxes are referred to as premium taxes, they are not taxes directly upon premiums. Defendant does not handle the premiums and has nothing to do with the money paid as premiums on the policies. The premiums collected in a year are made the basis for defendant to compute the amount of plaintiffs' taxes for having done business in this state within the year in question. It is not seriously contended that there is anything wrong with this method of computing the taxes.

(2) The amount of these taxes is but little if any burden upon plaintiffs. Under our statute (G. S. 1935, 40-913) defendant is authorized to fix the rate of premiums on fire insurance. In *Aetna Ins. Co. v. Travis*, 121 Kan. 802, 257 Pac. 337, where the validity of an order of the insurance commissioner fixing premium rates on fire insurance was questioned, the abstracts and briefs clearly show that in fixing the rates the insurance commissioner took into account all expenses of the insurance companies, including the premium tax on fire policies. Our statutes do not authorize defendant to fix premium rates on life insurance policies, the theory being that competition in that field will keep the rates reasonable. However, we think we are justified in assuming that the directors and managing officials of each life insurance company, in determining its premium rates, take into account the premium taxes paid to the state as a

part of the expense incident to the conduct of its business. Certainly there is nothing in this record to negative that view. The result is, plaintiffs do not pay a premium tax unless the premium has been collected, and the state permits them to include the expense of that tax in their premiums. If the state, in the exercise of its authority to raise money for state purposes, concludes to exact an indirect tax upon the holders of insurance policies, to be paid by them with their other premiums upon their policies, and as measured by such payment to exact a tax upon the insurance company for its privilege of obtaining and servicing and settling such policies in this state in harmony with its laws, we see no reason why that cannot be done. There is no contention here that such a procedure is invalid. There is no burden at all upon the insurance companies other than such clerical work as might be incident to the transaction, most if not all of which would be done in any event. Hence, there is no real basis here for saying that the so-called premium taxes upon these policies is a burden at all upon plaintiffs.

(3) The tax is not levied upon insurance transactions which cross state lines; it is measured only on the basis of business transacted in this state. It is in no sense a tax upon plaintiffs' business transactions which move across state lines.

Plaintiffs contend the tax in question is void because of discrimination between foreign and domestic insurance companies. It is true that domestic insurance companies are taxed on a different basis. They are not required to pay a tax measured by their premiums, but they are required to pay a capital stock tax (G. S. 1935, 79-310) and a tax upon the net value of their assets (G. S. 1935, 79-324 or 79-1201). All insurance companies pay an ad valorem tax upon their real estate and tangible personal property and certain admission fees and annual fees other than the tax in question, provided for by G. S. 1935, 40-252. In form this appears equal, but in fact it is not, for domestic companies have a relatively larger amount of tangible property in this state than foreign companies; many of them have none. The fact that the tax on domestic companies is upon a different basis than that upon foreign companies does not of itself render the tax invalid. (*Lincoln Nat. Life Ins. Co. v. Reed,* 325 U. S. 673, 65 S. Ct. 1220, 89 L. Ed. 1861.) We are unable to find in the record evidence to support the view that the tax in question upon foreign insurance companies is greater than that levied on the home insurance companies. More than that, the counter ab-

stract of the defendant clearly demonstrates that the foreign insurance companies have not been handicapped in transacting their state business in Kansas by reason of any differences in the method of taxation.

Plaintiffs argue that the tax is grossly excessive. That is based upon the view that it greatly exceeds the amount appropriated by the state for the maintenance of its insurance department. We do not regard that as the test. As we have seen, originally the tax was intended only for the support of the state insurance department, but that plan was soon dropped and the tax on foreign insurance companies is simply a part of the state's system of taxation, as hereinbefore pointed out. We see no merit in this contention. The agents' license fees were paid without protest by some of the plaintiffs and objected to by others, but in their briefs they have presented no specific reason why those fees are invalid. We find nothing in the record which would justify us in holding them invalid.

Plaintiffs contend that congress exceeded its powers by the passage of Public Law No. 15 (79th Congress, first session) set out in note 2. When we consider the eminent statesmen who framed this measure and urged its adoption we would concur in that view with great reluctance, if at all. It is argued that congress by this act could not validate invalid state laws. We agree with that contention and do not know of anyone who takes the opposite view. As we read it, congress did not attempt to do anything of the kind, but acted in its own sphere of authority. Under the constitution (art. 1, § 8, cl. 3) congress is given power "to regulate commerce . . . among the several states . . ." Congress was acting under that power. Perhaps it was prompted to pass the act because of the decision of the Supreme Court in *U. S. v. Underwriters Assn.*, supra, and because of suggestions made in the dissenting opinion of dire results which might follow from the opinion, which suggestions, as we read the opinion, were characterized therein as exaggerated. The pertinent portion of this statute reads:

"That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"SEC. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or super-

sede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance:   . . ."

No restatement by us could make clearer the intent of congress than the language used in the act.   In these cases it is stipulated that congress has passed no other act relating to insurance that is applicable in the cases before us.

It is specifically conceded by counsel for some of the plaintiffs, and the view is acted upon by others, that our statutes in question were valid prior to the decision in the case of *U. S. v. Underwriters Assn.*, supra.   Plaintiffs' contention is that that decision rendered our statutes void, but by the analysis we have hereinbefore made of that decision this contention cannot be sustained.   The result is our statutes are still valid and congress, by Public Law No. 15, *supra,* has left the matter of regulation and taxation of insurance companies to the states.

Finally we note that these are mandamus proceedings in which the court has the measure of discretion.   The amounts of the premium taxes assessed by defendant were collected by plaintiffs from their policyholders in 1944 under the specific authority or acquiescence of the state.   They make no tender to pay it back to them. It was due and payable to the defendant on May 1, 1945.   To permit plaintiffs to retain the amount of these taxes would amount to an unjust enrichment of them.   We find no equitable reason why it should not be paid.   Defendant is an executive officer, the head of a state department, whose duties are prescribed by law.   Under our statute (G. S. 1935, 60-1701) mandamus lies to compel the performance of any act which the law specifically enjoins as a duty resulting from an office.   Here we are asked to make an order compelling defendant not to do an act required by statute, but to do an act contrary to our statute.   We could do this only in the event we found our statutes in question to be absolutely void.   We are unable to so find.   Legislative acts are presumed valid.   Courts set them aside only when their invalidity is clear.   One who attacks them has the burden of establishing their invalidity.   Here plaintiffs have not sustained that burden.   The result is the writs prayed for should be denied.   It is so ordered.

NOTE 1.

| Case number. | State in which company was organized. | Date of organization. | Date admitted to do business in Kansas. | Number of Kansas agents as stated in motion for writ. | Taxes, or fee complained of, and amounts. | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Premium tax under G. S. 1935, 40-252 B. | Does it object to agent's license fee under same section? | Premium tax under G. S. 1935, 40-253. | Firemen's Relief Fund Tax under G. S. 1935, 40-1701, 40-1702, Supp. 40-1703. | (a) Stipulated to abide result in, or (b) briefed with case No.——. |
| 36,418 | Conn. | 1819 | 1871 | 260 | $6,150.27 | Yes | | $2,178.56 | 36,448 (a) |
| 36,421 | Conn. | 1917 | 1927 | (c) | 650.50 | Yes | | | 36,448 (a) |
| 36,422 | Iowa | 1896 | 1905 | 1 | 1,843.50 | No | | | 36,445 (a) |
| 36,423 | Texas | 1926 | 1928 | (c) | *4,269.22 | No | | | 36,445 (a) |
| 36,424 | Texas | 1924 | 1939 | 30 | *996.91 | No | | | 36,445 (a) |
| 36,425 | Iowa | 1879 | 1893 | 28 | 9,721.86 | No | | | 36,445 (a) |
| 36,426 | Tenn. | 1900 | 1911 | 68 | *30,997.04 | No | | | 36,445 (a) |
| 36,427 | Mich. | 1884 | † | 21 | 4,372.88 | No | | | 36,445 (a) |
| 36,428 | N. J. | 1875 | 1888 | 156 (d) | 102,666.15 | No | | | |
| 36,429 | Iowa | 1867 | 1888 | 28 (e) | 11,038.96 | No | | | 36,428 (b) |
| 36,445 | Calif. | 1896 | 1896 | 8 (f) | *9,104.86 | No | $1,037.89 | $20.30 | |
| 36,448 | Texas | 1913 | 1916 | 34 (g) | 1,095.45 | Yes | | | 36,445 (a) |
| 36,449 | Mass. | ..† | 1905 | | *4,148.75 | No | | | 36,445 (a) |
| 36,466 | Texas | ..† | 1933 | (h) | 3,042.63 | No | 2,962.80 | ‡ | 36,445 (a) |
| 36,478 | Vt. | 1850 | 1900 | 3 | *3,995.50 | No | | | 36,445 (a) |
| 36,491 | Texas | 1924 | 1932 | (i) | 2,828.99 | Yes | 2,750.76 | 87.96 | 36,448 (a) |

* Amount includes premium tax under G. S. 1935, 40-253.
† Date not given.
‡ Paid Firemen's Relief Fund Tax of $59.90 without protest.
(c) Has agents, number not stated; (d) also has 15 district offices with 65 employees; (e) and two general agents; (f) also two general offices with five employees; (g) also two branch offices; (h) one general agent and "more than 100" agents; (i) "many."

The following insurance companies have intervened in some one of the cases and stipulated to abide the result: World Fire and Marine Insurance Company, Standard Insurance Company of New York, Standard Surety and Casualty Company of New York, The Hawkeye Casualty Company, The American Fire Insurance Company, and The Gulf Insurance Company. Each of them complains of the premium tax and agents' license fees under G. S. 1935, 40-252, and those affected thereby complain of the premium tax under G. S. 1935, 40-253, and of the firemen's relief fund tax under G. S. 1935, 40-1701, G. S. 1943 Supp. 40-1702 and 40-1703.

A total of 22 insurance companies, by the proceedings brought or by intervening therein, have complained of the statutes in question and the taxes and fees provided for therein, while 457 other insurance companies, each organized under the laws of some state or country other than Kansas and heretofore admitted to do business in this state and assessed with the taxes upon their 1944 insurance business in Kansas and the fees provided for in the statutes in question, have paid such premium taxes, aggregating $1,142,996.49, and fees without protest and have received their respective certificates of authority to do business in this state for the year from May 1, 1945, to May 1, 1946.

NOTE 2.

"[PUBLIC LAW 15—79TH CONGRESS]

[CHAPTER 20—1ST SESSION]

[S 340]

AN ACT

"To express the intent of the Congress with reference to the regulation of the business of insurance

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"SEC. 2. (*a*) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(*b*) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and

the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission. Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

"Sec. 3. (a) Until January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, and the Act of June 19, 1936, known as the Robinson-Patman Anti-discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.

"(b) Nothing contained in this Act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

"Sec. 4. Nothing contained in this Act shall be construed to affect in any manner the application to the business of insurance of the Act of July 5, 1935, as amended, known as the National Labor Relations Act, or the Act of June 25, 1938, as amended, known as the Fair Labor Standards Act of 1938, or the Act of June 5, 1920, known as the Merchant Marine Act, 1920.

"Sec. 5. As used in this Act, the term 'State' includes the several States, Alaska, Hawaii, Puerto Rico, and the District of Columbia.

"Sec. 6. If any provision of this Act, or the application of such provision to any person or circumstances, shall be held invalid, the remainder of the Act, and the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected.

"Approved March 9, 1945."

Hoch, J. (dissenting): It is with regret that I find myself unable to concur in this decision. Various issues are involved, but in an effort to keep this statement within reasonable limits I shall limit it to the premium tax, which is the heart of the controversy.

First, as to the nature of the so-called premium tax. It is not in fact a tax upon insurance premiums. It is not assessed against any particular activities or transactions. It is simply a privilege tax— a tax exacted annually from certain foreign (out of state) companies for the privilege of transacting their insurance business in this state. (Pac. Mutual Life Ins. Co. v. Hobbs, 152 Kan. 230, 103 P. 2d 854.) The premiums received from Kansas policyholders are merely used as a measure for determining the amount of the privilege tax. The tax is not assessed against domestic (Kansas-incorporated) companies. The pertinent provision of the statute (G. S. 1935, 40-252B) is as follows:

"As a condition precedent to the issuance of the annual certificate of authority, provided in this code, every company organized under the laws of any other state of the United States or of any foreign country shall pay a tax upon

all premiums received during the preceding year at the rate of two per centum per annum, . . ."

It may promote brevity and clarity to state, at the outset, the two primary conclusions which impel me to dissent. Those conclusions are:

1. Plaintiff's business, *conducted in the manner and to the extent described in the agreed facts*—the business which they seek to conduct, in compliance with all other laws and regulations of Kansas—constitutes interstate commerce, under the decision of the United States Supreme Court in the Southeastern Underwriters case.

2. For the reason that the tax is exacted from foreign and not from domestic companies—both competing for the same business—and that no other equalizing tax is imposed upon domestic companies, it is *discriminatory* in character and constitutes an unconstitutional burden upon such commerce.

One or two preliminary observations may well be made. First, it is not our function to debate the issues decided by the Supreme Court of the United States in the Southeastern Underwriters case. That court having spoken, its decision is binding upon us and is to be accepted at full face value. It is our duty not only to seek to understand the decision,—and to me it does not seem difficult to understand—but also to apply it where its application is pertinent to an issue presented. In here applying the decision we are not resorting to mere "inferences,"—we are simply giving force to what was clearly declared. Next, I agree fully that in the Southeastern case the Supreme Court did not specifically pass upon the validity of any state law regulating or taxing insurance companies. That is our task, here, in applying the decision to the particular statute before us. Furthermore, it is very far from my view that the Southeastern decision nullified all state regulatory and tax laws dealing with "interstate insurance companies." On the contrary, there are countless regulatory statutes of the various states, based upon the exercise of police power, and other statutes—including nondiscriminatory tax statutes—which, in my opinion, are unaffected by the Southeastern decision,—at least in the absence of conflicting enactments by congress in the field now opened to it by that decision.

The Southeastern case, it is true, was a criminal case and the court was directly concerned only with the question of whether the indictment stated a cause of action under the Sherman antitrust act. It is also true that the court stated that only two questions were

presented by the record, namely, (1) whether the Sherman act is applicable to the conduct of fire insurance companies, and "(2) If so, do fire insurance transactions which stretch across state lines constitute 'Commerce among the several states' so as to make them subject to regulation by Congress under the Commerce clause." But in order to make clear its concept of transactions which "stretch across state lines" the court gave a full and forceful description of "the methods by which interstate insurance companies do business," to which reference will presently be made.

Before noting the court's analysis of this multi-state insurance business, it is well to remember the necessity for making that analysis. Question No. (2), *supra,* presented a fundamental issue of *federal jurisdiction.* Unless such insurance business constitutes "commerce . . . among the several states," congress, which possesses only those powers delegated to it in the constitution, had no jurisdiction to regulate it. Logically, therefore, this primary question was the first of the two questions to be discussed in the opinion. And in graphic language the court proceeded to describe the extent and nature of the insurance business of the large insurance companies. As a result of that analysis it reached the conclusion, expressed in language which to me seems perfectly clear, that such business, although composed of countless transactions—many of which may be local in character if considered in isolation—must be viewed in its entirety and that so viewed it is both *commerce* and *interstate* in character.

Now, what did the court say in the Southeastern case as to the nature of "the modern insurance business"? Dealing with it in realistic fashion it said—after an impressive statement noting its magnitude in total assets, volume, persons employed, etc.—

"This business is not separated into 48 distinct territorial compartments which function in isolation from each other. *Interrelationship, interdependence,* and *integration* of *activities in all the states* in which they operate are practical aspects of the insurance companies' methods of doing business. A large share of the insurance business is concentrated in a comparatively few companies located, for the most part, in the financial centers of the East. *Premiums collected from policyholders in every part of the United States flow into these companies for investment.* As policies become payable, *checks and drafts flow back* to the many states where the policyholders reside. The result is a *continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to the negotiation and execution of policy contracts.* Individual policyholders living in many

different states who own policies in a single company have their separate interests blended in *one assembled fund of assets upon which all are equally dependent for payment of their policies.* The decisions which that company makes at its home office—the risks it insures, the premiums it charges, the investments it makes, the losses it pays—concern not just the people of the state where the home office happens to be located. They concern people living far beyond the boundaries of that state.

"That the *fire insurance transactions alleged* to have been restrained and monopolized by appellees *fit the above described pattern of the national insurance trade* is shown by the indictment before us." (Italics supplied.) (p. 541.)

Now what sort of activities or transactions do we have at issue here? Under the stipulated facts, the business which our statute bars from Kansas unless the privilege tax is paid fits precisely "the above described pattern of the national insurance trade." Taking the stipulation in the Prudential case, as an example, it is agreed that its "business and operations radiate from the home office in Newark, New Jersey, into the forty-eight states (No. 11); that all applications and reports are transmitted by plaintiff's agents  .  .  . to the home office  .  .  . *where they are considered and acted upon and where all contracts and policies are executed and issued* and sent to the local agents for delivery to the assured *if and when the premium has been paid.*" (No. 12); that the board of directors,  .  .  . acting at its home office  .  .  . authorizes all investments," (No. 13); that "all bank deposits  .  .  . are subject to the control of the board of directors and that all securities (except securities deposited with governmental authorities as required by law or in connection with court proceedings) are subject to the control and management of the board of directors," (No. 14); that the plaintiff *acting through its district offices, agents and employees* in the state of Kansas, *pursuant to authority from the executive management,* solicits and accepts applications, accepts premiums, assumes risks *"when approved and issued* by the home office"; delivers contracts which *"when so issued and approved* become effective if and when premiums are paid"; etc., (Italics supplied). (No. 15)—all in harmony with the well-known methods of doing such insurance business.

If all of this is not a perfect pattern of the *"interrelationship, interdependence,* and *integration* of activities in all the states in which they operate" as described in the Southeastern opinion, I am unable to discover the distinction.

The majority opinion here treats the solicitation of contracts and

other such acts performed in Kansas as separate, isolated acts, wholly local in character. It is true that the Supreme Court said in the Southeastern case:

"It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities *which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states.* In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated." (Italics supplied.) (p. 548.)

But we are *not here dealing with a tax assessed against some particular activity* "intimately related to local welfare." We are dealing with a law which *bars* the plaintiffs from carrying on their whole *interrelated, interdependent* and *integrated business unless* the tax is paid. Furthermore, the Supreme Court dealt specifically, in the Southeastern opinion, with the very contention here made that the activities of local agents in soliciting business and contracts of insurance are matters wholly of local character and control. It said:

"Another reason much stressed has been that insurance policies are mere personal contracts subject to the laws of the state where executed. But this reason rests upon a distinction between what has been called 'local' and what 'interstate,' a type of mechanical criterion which this Court has not deemed controlling in the measurement of federal power. [Citing cases.] We may grant that a *contract of insurance, considered as a thing apart* from negotiation and execution, does not itself constitute interstate commerce. [Citing cases.] But it does not follow from this that the Court is powerless to examine the *entire transaction, of which that contract is but a part, in order to determine whether there may be a chain of events which becomes interstate commerce.* Only by treating the Congressional power over commerce among the states as a 'technical legal conception' rather than as a 'practical one, drawn from the course of business' could such a conclusion be reached. [Citing cases.] In short, a *nationwide business is not deprived of its interstate character merely because it is built upon sales contracts which are local in nature."* (Italics supplied.) (p. 546.)

Dealing, as it said, with the "practical aspects" of the "methods of doing business" by the "interstate insurance companies," the court held in unequivocal language that it is *interstate* in character. To say that activities described in the Southeastern case as an *integrated chain of transactions constituting* a *composite whole* are *interstate*

commerce under the Sherman act, and at the same time say that precisely the same chain of transactions as described in the agreed facts in this case are *not* interstate commerce, under our tax laws, would leave the subject in utter confusion, not only for laymen but for bench and bar as well.

Before proceeding to the second question—that of discrimination —note should be taken of defendant's contention that where one is engaged in both interstate and intrastate business a state may validly impose a tax upon the *intra*state part of the business; that the instant tax meets that test; that it is imposed only upon the privilege of carrying on local activities and transactions; and that if the plaintiffs desire to do so they can avoid the tax by doing their business solely by mail or other instrumentalities of interstate communication or transportation. The first answer to that argument has already been made, namely, that the very activities which the defendant refers to as purely local, such as personal contact by agents with insurance "prospects," solicitation of contracts, accepting premiums, assisting policyholders in preparing applications for loans, etc., are part and parcel of the activities specifically described in the Southeastern case as *interrelated, interdependent* and *integrated transactions* forming the company's *interstate business*. The second answer is that the suggestion that the plaintiffs could do away with local solicitors and other agents and do their business entirely by mail, telephone, and express—and possibly radio—is of course wholly unrealistic. The indispensable part played by personal solicitation and the countless personal services of assistance and all of that by insurance agents is a matter of common knowledge. The simple fact is that without the personal services of such agents no foreign company could do any insurance business—and particularly any life-insurance business—of any consequence in this state.

In support of its contention on this point defendant cities *Sprout v. City of South Bend*, 277 U. S. 163, 72 L. Ed. 833, and *Cooney v. Mountain States Tel. Co.*, 294 U. S. 384, 79 L. Ed. 934, and quotes as follows from the Sprout case:

"A state may . . . require payment of an occupation tax from one engaged in both intrastate and interstate commerce. . . . But in order that the fee or tax shall be valid it must appear that it is imposed solely on account of the intrastate business; that the amount exacted is not increased because of the interstate business done; that one engaged exclusively in interstate commerce would not be subject to the tax imposition; that the person taxed

could discontinue the intrastate business without withdrawing also from the interstate business." (pp. 170, 171.)

In my opinion, neither case is helpful to defendant's position. The Sprout case involved a municipal ordinance which required a license fee from busses using the city streets, no distinction being made as to interstate or intrastate business. The ordinance was declared void, and in an opinion by Mr. Justice Brandeis the test quoted, *supra,* was enunciated. Certainly in the case before us it does not appear that the tax "is imposed solely on account of the intrastate business." Nor, if we are to be at all realistic about it, does it appear "that the person taxed could discontinue the intrastate business without withdrawing also from the interstate business." The proposal of divorcement is anything but a "practical one, drawn from the course of business,"—to borrow a phrase from the Southeastern opinion.

The Cooney case, *supra,* is equally unhelpful to defendant. The case involved annual license taxes upon telephone instruments, used in both *intra* and *inter*state service. As in the instant case, it was argued in support of the tax that the telephone company "could discontinue its intrastate business without being compelled to withdraw from its interstate and foreign business." But the argument was rejected. Finding the tax to be "indivisible and indiscriminate in its application," the tax was declared void. In the opinion by Mr. Chief Justice Hughes it was emphasized that in order to uphold a state tax in such a case there must be a practical means of separation of the interstate and intrastate business of the company subjected to the tax. On that point the court cited, among many cases, *Bowman v. Continental Oil Co.,* 256 U. S. 642, 65 L. Ed. 1139, in which a New Mexico statute which levied an annual tax of fifty dollars upon each station distributing gasoline was held to be void under the commerce clause. Referring to the Bowman case the court said:

"The Court pointed out the distinction between an excise tax on sales of gasoline where, as the subject matter was separable, full protection could be afforded by enjoining enforcement as to the interstate business, and the *license tax* which with its prohibition fell *upon the business as a whole.* The Court said: 'But with the license tax it is otherwise. *If the statute is inseparable,* then both by its terms and by its legal operation and effect this tax is imposed generally upon the entire business conducted, including interstate commerce as well as domestic; and *the tax is void.'* The difficulty, continued the Court, 'is that, since plaintiff, so far as appears, *necessarily conducts its interstate and*

*domestic commerce in gasoline indiscriminately at the same stations and by the same agencies,* the license tax cannot be enforced at all without interfering with interstate commerce unless it be enforced otherwise than as prescribed by the statute—that is to say, without authority of law. Hence, it cannot be enforced at all.' " (Italics supplied.) (p. 394.)

I come to the second question. If plaintiff's business, considered as a whole, is interstate, may we bar it from Kansas unless the instant tax is paid? In my opinion it does not at all follow, under the later decisions of the United States Supreme Court that a state may not levy a fair and reasonable tax against such a business provided the tax is not discriminatory, and provided congress has not entered the field with enactments in conflict with the state statute.

Before considering the state's power in the matter, let me say a few words as to the discriminatory nature of the tax. I agree with the court's statement that it is a revenue measure, providing very substantial revenue for general state purposes. According to the stipulations, Kansas receives annually about a million and a half dollars from the premium tax alone. This revenue is turned into the general fund in the state treasury. It is further stipulated that the total cost of maintaining the Insurance Department, the state's regulatory agency, does not exceed fifty thousand dollars a year. Both foreign and domestic companies pay the same ad valorem tax upon all their property, real and personal, including intangibles, within the state. Both foreign and domestic companies are required to pay certain fees for filing applications, annual statements, renewal of certificates, agent's licenses, etc., which in the aggregate are substantially the same. Neither domestic nor foreign companies pay any income tax to Kansas. The only tax imposed upon domestic companies and not upon foreign companies is an ad valorem tax on the amount of their capital stock in excess of investment in real and personal property in this or other states. But it is now urged that the plaintiffs have not shown that no comparable tax burden is imposed upon domestic companies. It is also argued that since domestic companies own more property in Kansas and therefore pay more ad valorem taxes in amount upon their property in Kansas— real and personal, including intangibles—than do the foreign companies they are thereby at a disadvantage in competing for the business. The answer to the latter argument is obvious. The proposition works both ways. The foreign companies likewise have more property in their home states and therefore pay more ad valorem taxes there than do the Kansas companies.

In my opinion, the fact of discrimination clearly appears, in view of the whole record, and I find no reason to labor the point. These actions were brought under a stipulation expressing the "desire of all interested parties herein, including the Attorney General of the State of Kansas, The Insurance Commissioner of the State of Kansas, and the said company to have the issues presented in said action determined as speedily as possible," etc. No one contended in oral argument and no one contends now that the capital stock tax is comparable or equivalent to the premium tax. I prefer to deal forthrightly with the real issues which these actions were brought to have determined "as speedily as possible."

The question, then, is whether the state may bar a foreign company from doing its interstate business in this state unless it pays a revenue-producing tax which is not assessed against its competitor, the domestic company.

The cases which deal with the power of a state to impose conditions upon a foreign company as to the doing of an *intra*state business within its borders are not pertinent to the issue here. It has long been held that a state may *exclude* a foreign corporation which seeks authority to transact wholly local or intrastate business. Having the power to exclude it can impose conditions, including payment of a tax, leaving the foreign corporation the choice of accepting the conditions or staying out of the state. This rule was invoked in the recent case of *Lincoln Natl. Life Ins. Co. v. Read,* 325 U. S. 673, 89 L. Ed. 1861, decided by the Supreme Court soon after its decision in the Southeastern case. In that case attack was made upon an insurance premium tax law similar to ours. The case had been brought prior to the decision in the Southeastern case. At that time it was generally regarded as settled law, under numerous decisions, beginning with *Paul v. Virginia,* in 1869, that the insurance business is not commerce and that it was therefore exclusively under state jurisdiction. The contention in the Oklahoma case was solely that the law violated the Fourteenth Amendment. The court held that the law was not vulnerable to that attack. But it was made plain that the issue of interstate commerce was not presented and was not being determined. The opening sentence of the opinion reads: "The sole question presented by this appeal is whether Oklahoma has denied appellant the equal protection of the laws *in violation of the Fourteenth Amendment.*" (Italics supplied.) And a footnote to the opinion reads: "It is not contended that appellant

is engaged in interstate commerce, hence we do not have presented any question concerning the effect of *United States v. Southeastern Underwriters Assn.*, 322 U. S. 533, on the problem." Accordingly, the case furnishes no guidance in the issue here.

At this point let me make it clear that I am not discussing the contention that even though it be nondiscriminatory a state may not place a tax or other "burden" upon interstate commerce. Plaintiffs say that it may not do so, citing many supporting authorities. Perhaps the most frequently quoted statements in support of that view are those taken from the opinion by Mr. Justice Hughes in the so-called *Minnesota rate cases* (*Simpson v. Shepard*, 230 U. S. 352, 57 L. Ed. 1511). It was there said: "If a state enactment imposes a *direct burden* on interstate commerce, it must fall regardless of Federal legislation. . . . Thus, the states cannot tax interstate commerce either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or upon the receipts, as such, derived from it." Similar declarations have appeared in many subsequent cases, including *Kansas Natural Gas Co. v. State of Kansas, ex rel.*, 265 U. S. 298, 68 L. Ed. 1027, reversing a decision of this court. (*State, ex rel., v. Gas Co.*, 111 Kan. 809, 208 Pac. 622.) But such unqualified declarations have, in my opinion, been materially modified by later decisions—or perhaps it would be more accurate to say that the idea of what constitutes a *burden* upon interstate commerce has been given an interpretation that emphasizes *discrimination*. Indeed, it may well be argued that where congress has not acted and a fair and reasonable state tax is imposed equally upon competitors, domestic and foreign, the word "burden" gives a wrong connotation. In any event, it has many times been held that even though a field may be subject to federal regulation under the commerce clause, a state may validly regulate, at least as to those aspects of the subject which are intrastate in character when considered apart from their interstate relationships. I incline to the view that in the absence of legislation by congress a nondiscriminatory insurance tax is not necessarily invalid. And I also agree that, except to the extent presently to be noted in discussion of the so-called McCarran Act (Public Law No. 15, 79th Congress), congress has not entered the field of insurance regulation.

The question of the power of a state to impose a tax against interstate commerce in the absence of federal regulation, even though the state tax be nondiscriminatory, need not be pursued further. What-

ever conflicting statements may be found in decisions of the U. S. Supreme Court on that question, I know of none which upholds a state law which *discriminates against interstate commerce*, even though congress has not entered the field. Here are a few typical quotations from the many that might be cited:

"The Commerce clause, by its own force, *prohibits discrimination against interstate commerce*, whatever its form or method. . . . It was to end these practices that the Commerce clause was adopted." (*South Carolina v. Barnwell Bros.*, 303 U. S. 177, 82 L. Ed. 734.) "The Commerce clause *forbids discrimination*, whether forthright or ingenious." (*Best & Co. v. Maxwell*, 311 U. S. 454, 85 L. Ed. 275.)

"This Court has repeatedly held that the grant of power to Congress by the Commerce clause did not wholly withdraw from the states the authority to regulate the commerce with respect to matters of local concern, on which Congress has not spoken. . . . A fortiori there are many subjects and transactions of local concern not themselves interstate commerce or a part of its operations which are within the regulatory and taxing power of the states, *so long as state action serves local ends and does not discriminate against the commerce,* even though the exercise of those powers may materially affect it." (*Parker v. Brown*, 317 U. S. 341, 87 L. Ed. 315, 331.)

"Forms of state taxation whose tendency is to prohibit the commerce or place it *at a disadvantage as compared or in competition with intrastate commerce* and *any state tax which discriminates* against the commerce are familiar examples of the exercise of state taxing power in an unconstitutional manner." (*McGoldrick v. Berwind-White Coal Mining Co.*, 309 U. S. 33, 84 L. Ed. 565.)

"We only hold that where a state seeks to tax gross receipts from interstate transactions consummated within its borders, its power to do so cannot be withheld on constitutional grounds *where it treats wholly local transactions in the same way."* (*Harvester Co. v. Department of Treasury*, 322 U. S. 340. 88 L. Ed. 1319.)

"The very object of investing this power (Commerce clause) in the general government was to insure this uniformity *against discriminating state legislation."* (*Welton v. Missouri*, 1 Otto 275, 23 L. Ed. 347.)

"No state can tax so *as to discriminate against interstate commerce."* (Concurring opinion by Mr. Justice Frankfurter in *State Tax Commission v. Aldrich*, 316 U. S. 174, 86 L. Ed. 1358.)

In *Harvester Co. v. Department of Treasury*, supra, in which a nondiscriminatory income tax was upheld, it was said in the opinion by Mr. Justice Douglas: "But in each *a local transaction* is made the taxable event and *that event is separate* and *distinct* from the transportation or intercourse which is interstate commerce. In neither *does the tax aim at or discriminate against interstate commerce."*

The Supreme Court has many times called attention to the con-

sequences involved if it be conceded that a state has power to discriminate against interstate commerce. For example:

" 'But, assuming the tax to be, as we have supposed, a discriminating tax, levied exclusively upon the products of sister states, and *looking to the consequences which the exercise of this power may produce if it be once conceded,* amounting, as we have seen, to a total abolition of all commercial intercourse between the states, under the cloak of taxing power, *we are not prepared to admit that a state can exercise such a power, though congress may have failed to act on the subject* in any manner whatever.' " (*Minnesota v. Barber,* 133 U. S. 313, 330, 34 L. Ed. 455.)

"Nice distinctions have been made at times between direct and indirect burdens. They are irrelevant when the avowed purpose of the obstruction, *as well as its necessary tendency,* is to suppress or *mitigate the consequences of competition* between the states. Such an obstruction is direct by the very terms of the hypothesis." (*Baldwin v. G. A. F. Seelig, Inc.,* 294 U. S. 511, 79 L. Ed. 1032.)

Brief note should be taken of one or two further contentions made in the able brief of the defendant. It is earnestly argued that in the exercise of its power to regulate interstate commerce congress may validly *empower the states to enact laws which discriminate* in favor of intrastate and against interstate commerce. The argument is that the commerce clause itself contains nothing about discrimination and that such a federal measure would simply be, in effect, a regulation by congress. I shall not discuss at length that interesting contention. Assuming—and nothing more—that a federal statute of that sort could be framed which would not only be valid under the commerce clause but would survive the test of constitutionality under the 5th and 14th amendments, the fact is that congress has not enacted any such a measure. Certainly the McCarran act attempts nothing so unprecedented.

A further contention by the defendant is that the tax is shown not to be discriminatory by the fact that it has been in effect for many years and that the plaintiffs have been able to do an expanding business in spite of the tax. Certainly that cannot be a test of discrimination under the law. Certainly a discriminatory burden imposed upon only one of two competitors does not cease to be discriminatory merely because he is able to bear it and even to do well in spite of it. Either he must do business on a narrower margin, or compensate by some cut in operating cost, or by some added inducement manage to pass the burden on to his customer. *Equality of treatment* is the test, and not whether a competitor can manage to do business and even prosper in spite of inequality.

In this connection it is suggested in the court's opinion that in any event the tax cannot be regarded as a burden upon the plaintiffs because they doubtless take it into account in fixing the premiums and thus pass on to the policyholders whatever burden results from the tax. It is said in the opinion that if the state concludes to exact an indirect tax upon the holders of insurance policies in this manner, for revenue purposes, no reason appears why that cannot be done. The fact that the plaintiffs may be able to pass the burden on to policyholders in Kansas in no way answers the issue of discrimination, under the law. If it did, any discrimination against an interstate competitor would cease to be discrimination if it could be shown that he had succeeded in making his customers bear the burden.

In connection with the issue of discrimination it is pertinent to note that while all states have had an insurance premium tax, it appears that even prior to the Southeastern decision there were at least eleven states in which it was imposed without discrimination,— that is, at the same rate upon both foreign and domestic companies —and that in at least sixteen others it was probably nondiscriminatory for the reason that other and equalizing taxes were imposed upon the domestic companies. Following the Southeastern decision bills to remove discrimination were introduced in the 1945 sessions of legislatures in many, if not most, of the states having a discriminatory premium tax. In Arizona, Arkansas, Georgia, Maine, South Dakota, Tennessee, Washington, West Virginia, and possibly others such bills have become law. These facts appear in Bulletin BX-252, April, 1945, entitled "Federal Action with Respect to Regulation of Insurance," issued by the Council of State Governments for the guidance of state officials. Assuming this compilation to be accurate it appears that in a very substantial majority of the states statutory recognition has now been given to the necessity of removing discrimination. Incidentally, it should be remembered that whenever a single-state company extends its business to other states it then reaps a benefit from the principle that there can be no discrimination against interstate commerce.

Lastly, the defendant contends that whatever question as to the validity of the premium tax may have been raised by the Southeastern decision, all doubts were removed by the passage of the McCarran Act,—Public Law No. 15, 79th Congress. I must wholly disagree with that view. And let me say at once that I also wholly

disagree with any view that in the McCarran Act congress exceeded its powers. Nor do I understand that the plaintiffs so contend, as stated in the court's opinion. It is true that in one of the briefs there is one statement to that effect, but that statement is out of harmony with all the contentions made by the other plaintiffs elsewhere throughout all the many other briefs. I understand the position of plaintiffs to be that the McCarran Act is invalid only if given some of the interpretations urged by defendant, and that it is valid if properly construed. In any event, it is my view that the McCarran Act is not only valid, but that it has performed a very important and useful function. Let us note, first, the circumstances which attended its enactment. By the Southeastern decision—which was described in the report of the Judiciary Committee of the United States Senate as a "precedent-smashing decision"—the Supreme Court held that the business of insurance is not only commerce but, as conducted by the larger companies, it is *interstate commerce,* and therefore subject to Federal regulation; also, that since the Sherman Act is framed in general terms and carries no provision exempting it, insurance business is subject to its prohibitions and penalties. In order to allay alarm and lessen confusion as to the effect of the decision, the McCarran Act was passed. Obviously congress could not overrule the finding that such insurance business constitutes interstate commerce. That question is for judicial and not for legislative determination. But congress could determine to what extent the field should be entered by the federal government. What, then, did the McCarran Act do? First, as to the Sherman Act, the Clayton Act, and the Federal Trade Commission Act, it provided that they should be applicable, after January 1, 1948, to the business of insurance "to the extent that such business is not regulated by state law;" that until January 1, 1948, such acts and "the Robinson-Patman Antidiscrimination Act should not apply to the insurance business," but that these provisions should not render the Sherman Act inapplicable "to any agreement to boycott, coerce or intimidate." Further, that no federal act should be construed to invalidate or impair any state regulatory or tax law with reference to the business of insurance unless such federal act "specifically relates to the business of insurance." All these and one or two other such provisions were, in effect, simply amendments to the various federal acts which congress, of course, had power to make. They wrote into the federal acts exceptions or provisos, the absence of which in the Sherman Act

had been noted in the Southeastern opinion. They thus clarified the scope of existing federal law. In further declaration that congress had not otherwise entered the insurance field now opened to it, it was said in the McCarran Act that "the continued regulation and taxation by the several states of the business of insurance is in the public interest," and that "the business of insurance . . . shall be subject to the laws of the several states which relate to the regulation or taxation of such business." This was a reassuring expression of the congressional attitude and intention, but certainly it did not delegate to the states—and could not do so—any power which they did not already have. It is elementary that the dividing line between state and federal power is fixed in the constitution, as construed by the Supreme Court. If congress could alter that line at will it could by statute nullify the constitution. Assuredly congress did not mean to say by the McCarran Act that a state might now impose discriminatory burdens upon interstate commerce or contravene any of the constitutional guaranties. If it had attempted any such thing its effort would, of course, have been futile. In the McCarran Act congress has now clearly said that, except to the extent indicated, it has not entered the field of insurance regulation. And no regulatory state law is now threatened with the contention that it conflicts with federal regulation. Nor is any such state law in danger, provided always, that it does not exceed constitutional limits as judicially determined. I have no notion that the able men who framed the McCarran Act were foolishly saying to the states that as far as the insurance business is concerned they might now pass a discriminatory or otherwise unconstitutional statute if they desired to do so.

In conclusion, we are not, of course, here dealing with public policy. If there are evils in bigness, if there are monopolistic or other practices of the big insurance companies which work inequality of opportunity, to the public or private harm, sound and effective measures of correction can and should be found—within the framework of fundamental law. In the Southeastern decision its friends see a step in that direction. In any event, it is our function only to interpret the law and to apply it with impartiality to the best of our understanding.

Giving effect to the clear and definite pronouncements of the United States Supreme Court in the Southeastern case, the Kansas premium tax law has become invalid, in my opinion, because it dis-

criminates against interstate commerce. Our other statutes have various regulatory and taxing provisions with which plaintiffs declare themselves ready to comply. Under those statutes they are required to secure a certificate of authority to transact their insurance business in this state. Being willing to comply with all valid requirements they are entitled to receive it. I would allow the writ.

WEDELL and BURCH, JJ., join in the foregoing dissenting opinion.