WESTERN & SOUTHERN LIFE INSURANCE CO. *v.*
STATE BOARD OF EQUALIZATION OF
CALIFORNIA

No. 79–1423.  Argued January 12, 1981—Decided May 26, 1981

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 674.

*Alan R. Vogeler* argued the cause and filed briefs for appellant.

*Timothy G. Laddish,* Deputy Attorney General of California, argued the cause for appellee. With him on the brief was *George Deukmejian,* Attorney General.*

JUSTICE BRENNAN delivered the opinion of the Court.

California imposes two insurance taxes on insurance companies doing business in the State. A premiums tax, set at a fixed percentage of premiums paid on insurance policies is-

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General McCree, Assistant Attorney General Ferguson, Stuart A. Smith, Michael L. Paup,* and *Ernest J. Brown* for the United States; by *Robert Abrams,* Attorney General, *Shirley Adelson Siegel,* Solicitor General, and *Jeremiah Jochnowitz,* Assistant Solicitor General, for the State of New York; and by *Jerome R. Hellerstein* and *William B. Randolph* for the Life Insurance Council of New York.

Briefs of *amici curiae* urging affirmance were filed by *Robert K. Corbin,* Attorney General of Arizona, *Edwin P. Lee,* and *Bronson C. La Follette,* Attorney General of Wisconsin, for the State of Arizona et al.; by *William M. Leech, Jr.,* Attorney General, *Jimmy G. Creecy,* Deputy Attorney General, and *Kate Eyler,* Assistant Attorney General, for the State of Tennessee; and by *Matthew J. Zinn* for the American Insurance Association et al.

sued in the State, is imposed on both foreign and domestic insurance companies and a "retaliatory" tax, set in response to the insurance tax laws of the insurer's home State, is imposed on some foreign insurance companies. This case presents the question of the constitutionality of retaliatory taxes assessed by the State of California against appellant Western & Southern Life Insurance Co., an Ohio corporation, and paid under protest for the years 1965 through 1971.

## I

Section 685 of the California Insurance Code imposes a retaliatory tax on out-of-state insurers doing business in California, when the insurer's State of incorporation imposes higher taxes on California insurers doing business in that State than California would otherwise impose on that State's insurers doing business in California.[1] In computing the re-

---

[1] "When by or pursuant to the laws of any other state or foreign country any taxes, licenses and other fees, in the aggregate, and any fines, penalties, deposit requirements or other material obligations, prohibitions or restrictions are or would be imposed upon California insurers, or upon the agents or representatives of such insurers, which are in excess of such taxes, licenses and other fees, in the aggregate, or which are in excess of the fines, penalties, deposit requirements or other obligations, prohibitions, or restrictions directly imposed upon similar insurers, or upon the agents or representatives of such insurers, of such other state or country under the statutes of this State, so long as such laws of such other state or country continue in force or are so applied, the same taxes, licenses and other fees, in the aggregate, or fines, penalties or deposit requirements or other material obligations, prohibitions, or restrictions, of whatever kind shall be imposed upon the insurers, or upon the agents or representatives of such insurers, of such other state or country doing business or seeking to do business in California. Any tax, license or other fee or other obligation imposed by any city, county, or other political subdivision or agency of such other state or country on California insurers or their agents or representatives shall be deemed to be imposed by such state or country within the meaning of this article." Cal. Ins. Code Ann. § 685 (West 1972).

This provision was enacted in present form in 1959, pursuant to the California Constitution, Art. XIII, § 14-4/5 (f) (3). At that time, the

taliatory tax owed by a given out-of-state insurer, California subtracts the California taxes otherwise due from the total taxes that would be imposed on a hypothetical similar California company doing business in the out-of-state insurer's State of incorporation. If the other State's taxes on the hypothetical California insurer would be greater than California's taxes on the other State's insurer, a retaliatory tax in the amount of the difference is imposed. If the other State's taxes on the hypothetical California insurer would be less than or equal to California's taxes, however, California exacts no retaliatory tax from the other State's insurer.

Western & Southern, an Ohio corporation headquartered in Ohio, has engaged in the business of insurance in California since 1955. During the years in question, the company paid a total of $977,853.57 to the State in retaliatory taxes. After unsuccessfully filing claims for refunds with appellee Board of Equalization, Western & Southern initiated this refund suit in Superior Court, arguing that California's retaliatory tax violates the Commerce and Equal Protection Clauses of the United States Constitution.[2]

---

California Constitution permitted imposition of the retaliatory tax only when the other State taxed California insurers at a higher rate than it taxed its own insurers. See Cal. Const., Art. XIII, § 14-4/5 (f) (3) (West Supp. 1964). In 1964, however, the California Constitution was amended to permit the imposition of the retaliatory tax whenever the other State's taxes on California insurers are higher than California taxes on similar insurers. Cal. Const., Art. XIII, § 14-4/5 (f) (3) (West. Supp. 1966). See *Franklin Life Ins. Co.* v. *State Board of Equalization,* 63 Cal. 2d 222, 225–227, 404 P. 2d 477, 480–481 (1965).

[2] Western & Southern also challenges a provision of California's property tax law, since repealed, which permitted certain domestic insurance companies to credit a greater portion of property tax paid on their principal offices against their premiums tax liability than foreign insurers could credit. Cal. Rev. & Tax. Code Ann. §§ 12241 (a) and (b) (West 1970). We need not consider this challenge, because any increase in the property tax deduction would merely trigger an offsetting increase in the retaliatory tax. See App. 86–87.

The Superior Court tried the case on stipulated facts without a jury, and ruled that the retaliatory tax is unconstitutional. It ordered a full refund of retaliatory taxes paid, plus interest and costs. App. 78–79. The California Court of Appeal reversed, upholding the retaliatory tax. 99 Cal. App. 3d 410, 159 Cal. Rptr. 539. The California Supreme Court denied Western & Southern's petition for hearing. App. 89. Western & Southern filed a notice of appeal in this Court, and we noted probable jurisdiction. 449 U. S. 817 (1980). We affirm.

## II

The Commerce Clause provides that "The Congress shall have Power . . . To regulate Commerce . . . among the several States." U. S. Const., Art. I, § 8, cl. 3. In terms, the Clause is a grant of authority to Congress, not an explicit limitation on the power of the States. In a long line of cases stretching back to the early days of the Republic, however, this Court has recognized that the Commerce Clause contains an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce.[3] Even in the absence of congressional action, the courts may decide whether state regulations challenged under the Commerce Clause impermissibly burden interstate commerce. See, e. g., Minnesota v. Clover Leaf Creamery Co., 449 U. S. 456 (1981); Philadelphia v. New Jersey, 437 U. S. 617 (1978).

Our decisions do not, however, limit the authority of Congress to regulate commerce among the several States as it sees fit. In the exercise of this plenary authority, Congress may "confe[r] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." Lewis v. BT Investment Managers, Inc., 447 U. S. 27, 44 (1980); see H. P. Hood & Sons, Inc. v. Du Mond, 336 U. S. 525, 542–543 (1949). If Congress ordains that the States

---

[3] See Cooley v. Board of Wardens, 12 How. 299 (1852); Gibbons v. Ogden, 9 Wheat. 1, 209 (1824).

may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge.

Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance when it passed the McCarran-Ferguson Act, 59 Stat. 33, 15 U. S. C. § 1011 *et seq.*, as this Court acknowledged in *State Board of Insurance* v. *Todd Shipyards Corp.*, 370 U. S. 451, 452 (1962). See also *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 219, n. 18 (1979); *Wilburn Boat Co.* v. *Firemen's Fund Ins. Co.*, 348 U. S. 310, 319 (1955). Nevertheless, Western & Southern, joined by the Solicitor General as *amicus curiae,* argues that the McCarran-Ferguson Act does not permit "anti-competitive state taxation that discriminates against out-of-state insurers." Brief for Appellant 28; Brief for United States as *Amicus Curiae* 16. We find no such limitation in the language or history of the Act.

Section 1 of the Act, 59 Stat. 33, 15 U. S. C. § 1011, contains a declaration of policy:

> "Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

Section 2 (a), 59 Stat. 33, 15 U. S. C. § 1012 (a), declares: "The business of insurance . . . shall be subject to the laws of the several States which relate to the regulation or taxation of such business." The unequivocal language of the Act suggests no exceptions.

The McCarran-Ferguson Act was passed in the wake of *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944), which held that insurance is "commerce" within the meaning of the Commerce Clause. Prior to *South-East-*

*ern Underwriters,* insurance was not considered to be commerce within the meaning of the Commerce Clause, *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495 (1913); *Paul* v. *Virginia,* 8 Wall. 168 (1869), and thus "negative implication from the commerce clause was held not to place *any limitation* upon state power over the [insurance] business." *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 414 (1946) (emphasis added). Believing that the business of insurance is "a local matter, to be subject to and regulated by the laws of the several States," H. R. Rep. No. 143, 79th Cong., 1st Sess., 2 (1945), Congress explicitly intended the McCarran-Ferguson Act to restore state taxing and regulatory powers over the insurance business to their pre-*South-Eastern Underwriters* scope. H. R. Rep. No. 143, *supra,* at 3; see *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 459 (1969); *Maryland Casualty Co.* v. *Cushing,* 347 U. S. 409, 412–413 (1954).

The Court has squarely rejected the argument that discriminatory state insurance taxes may be challenged under the Commerce Clause despite the McCarran-Ferguson Act. *Prudential Ins. Co.* v. *Benjamin, supra; Prudential Ins. Co.* v. *Hobbs,* 328 U. S. 822 (1946) *(per curiam).* In *Benjamin,* the Court considered a South Carolina insurance premiums tax imposed solely on foreign insurance companies. The Court found it unnecessary to decide whether the tax "would be valid in the dormancy of Congress' power," 328 U. S., at 427, or whether the tax "would be discriminatory in the sense of an exaction forbidden by the commerce clause," *id.,* at 428. Expressly *assuming* that the tax would be discriminatory, *id.,* at 429, the Court held that enactment of the McCarran-Ferguson Act "put the full weight of [Congress'] power behind existing and future state legislation to sustain it from any attack under the commerce clause to whatever extent this may be done with the force of that power behind it, subject only to the exceptions expressly provided for." *Id.,* at 431. In *Hobbs,* this Court sustained against a Commerce Clause challenge a Kansas retaliatory insurance tax indistinguishable

from California's.[4]  The Kansas Supreme Court, upholding the retaliatory tax, had held that the McCarran-Ferguson Act "left the matter of regulation and taxation of insurance companies to the states." *In re Insurance Tax Cases,* 160 Kan. 300, 313, 161 P. 2d 726, 735 (1945). This Court summarily affirmed, citing *Benjamin* and its companion case, *Robertson* v. *California,* 328 U. S. 440 (1946). *Prudential Ins. Co.* v. *Hobbs, supra,* at 822.[5]

We must therefore reject Western & Southern's Commerce Clause challenge to the California retaliatory tax: the McCarran-Ferguson Act removes entirely any Commerce Clause restriction upon California's power to tax the insurance business.

## III

Ordinarily, there are three provisions of the Constitution under which a taxpayer may challenge an allegedly discriminatory state tax: [6] the Commerce Clause, see, *e. g., Complete*

---

[4] The California courts have described the Kansas retaliatory insurance tax as "substantially identical" to § 685.  *Atlantic Ins. Co.* v. *State Board of Equalization,* 255 Cal. App. 2d 1, 10, 62 Cal. Rptr. 784, 790 (1967), cert. denied and appeal dism'd, 390 U. S. 529 (1968).

[5] Western & Southern argues that the instant case is not controlled by *Hobbs* because the Kansas Supreme Court said in *Hobbs:* "We are unable to find in the record evidence to support the view that the tax in question upon foreign insurance companies is greater than that levied on the home insurance companies." 160 Kan., at 311, 161 P. 2d, at 734. But the principle of *Benjamin,* applied in *Hobbs,* was that it was *unnecessary* for the Court to decide whether the challenged tax was discriminatory, since the McCarran-Ferguson Act simply made the Commerce Clause inapplicable. Thus, Western & Southern's reliance on this purported distinction carries no weight.

[6] We reject appellee's argument that the McCarran-Ferguson Act altered constitutional standards other than those derived from the Commerce Clause.  The House Report states:

"It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Under-*

*Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977); the Privileges and Immunities Clause of Art. IV, § 2, see, *e. g., Toomer* v. *Witsell,* 334 U. S. 385 (1948); and the Equal Protection Clause, see, *e. g., Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562 (1949).[7] This case assumes an unusual posture, however, because the Commerce Clause is inapplicable to the business of insurance, see Part II, *supra,* and the Privileges and Immunities Clause is inapplicable to corporations, see *Hemphill* v. *Orloff,* 277 U. S. 537, 548–550 (1928). Only the Equal Protection Clause remains as a possible ground for invalidation of the California tax.[8]

The Fourteenth Amendment forbids the States to "deny to any person within [their] jurisdiction the equal protec-

―――――――

*writers Association* case. Briefly, your committee is of the opinion that we should provide for the continued regulation and taxation of insurance by the States, subject always, however, to the limitations set out in the controlling decisions of the United States Supreme Court . . . ." H. R. Rep. No. 143, 79th Cong., 1st Sess., 3 (1945).

In *State Board of Insurance* v. *Todd Shipyards Corp.,* 370 U. S. 451 (1962), we said:

"Congress, of course, does not have the final say as to what constitutes due process under the Fourteenth Amendment. And while Congress has authority by § 5 of that Amendment to enforce its provisions [citing cases], the McCarran-Ferguson Act does not purport to do so." *Id.,* at 457.

[7] Although Western & Southern raises a due process claim in its statement of questions presented, it does not separately address that claim in its brief. We therefore assume that any due process argument is subsumed in the equal protection issue. See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 470, n. 12 (1981).

[8] *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408 (1946), did not resolve the equal protection issue. The Court stated in reference to the South Carolina tax challenged in that case:

"No conceivable violation of the commerce clause, in letter or spirit, is presented. Nor is contravention of any other limitation." *Id.,* at 436.

The appellant in that case, however, challenged the South Carolina tax under the Commerce Clause, *id.,* at 411, and nothing in the opinion of the Court suggests that the Court considered or decided any equal protection issue.

tion of the laws," but does not prevent the States from making reasonable classifications among such persons. See *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 359–360 (1973); *Allied Stores of Ohio* v. *Bowers*, 358 U. S. 522, 526–527 (1959). Thus, California's retaliatory insurance tax should be sustained if we find that its classification is rationally related to achievement of a legitimate state purpose.

But as appellee points out, state tax provisions directed against out-of-state parties have not always been subjected to such scrutiny. Rather, a line of Supreme Court cases most recently exemplified by *Lincoln National Life Ins. Co.* v. *Read*, 325 U. S. 673 (1945), holds that a State may impose a tax on out-of-state corporations for the "privilege" of doing business in the State, without any requirement of a rational basis. Since the California courts have defined the retaliatory tax as a "privilege" tax, *Western & Southern Life Ins. Co.* v. *State Board of Equalization*, 4 Cal. App. 3d 21, 35, 84 Cal. Rptr. 88, 97–98 (1970), application of the reasoning of these cases would require us to sustain the tax without further inquiry into its rational basis. We must therefore decide first whether California's retaliatory tax is subject to such further inquiry.

Some past decisions of this Court have held that a State may exclude a foreign corporation from doing business or acquiring or holding property within its borders. *E. g., Asbury Hospital* v. *Cass County*, 326 U. S. 207, 211 (1945); *Bank of Augusta* v. *Earle*, 13 Pet. 519, 588–589, 592 (1839). From this principle has arisen the theory that a State may attach such conditions as it chooses upon the grant of the privilege to do business within the State. *Paul* v. *Virginia*, 8 Wall., at 181. While this theory would suggest that a State may exact any condition, no matter how onerous or otherwise unconstitutional, from a foreign corporation desiring to do business within it, this Court has also held that a State may not impose *unconstitutional* conditions on the grant of a priv-

ilege. *E. g., Sherbert* v. *Verner,* 374 U. S. 398, 404 (1963);
*Wieman* v. *Updegraff,* 344 U. S. 183, 192 (1952); *Frost &*
*Frost Trucking Co.* v. *Railroad Comm'n,* 271 U. S. 583, 592–
593 (1926).

These two principles are in obvious tension. If a State
cannot impose unconstitutional conditions on the grant of a
privilege, then its right to withhold the privilege is less than
absolute. But if the State's right to withhold the privilege
is absolute, then no one has the right to challenge the terms
under which the State chooses to exercise that right. In
view of this tension, it is not surprising that the Court's at-
tempt to accommodate both principles has produced results
that seem inconsistent or illogical. Compare *Doyle* v. *Con-*
*tinental Ins. Co.,* 94 U. S. 535 (1877), with *Insurance Co.* v.
*Morse,* 20 Wall. 445 (1874); and compare *Lincoln National*
*Life Ins. Co.* v. *Read, supra,* with *Hanover Fire Ins. Co.* v.
*Harding,* 272 U. S. 494 (1926).

The doctrine that a State may impose taxes and conditions
at its unfettered discretion on foreign corporations, in return
for granting the "privilege" of doing business within the
State, originated in *Paul* v. *Virginia, supra,* a case decided
only 15 months after the effective date of the Fourteenth
Amendment. A Virginia statute required foreign insurance
companies to purchase and file a specified amount of bonds as
security for the protection of persons insured. No such re-
quirement was imposed on domestic insurers. Several New
York insurance companies refused to comply, and their agent
was accordingly denied a license to engage in the insurance
business in Virginia. The agent was prosecuted for selling in-
surance without a license; he defended on the ground that the
statute was unconstitutional under the Privileges and Im-
munities Clause of Art. IV, § 2, and the Commerce Clause.[9]

---

[9] The Court disposed of plaintiff in error's Commerce Clause argument
on the ground that the business of insurance is not commerce. 8 Wall., at
183. See *supra,* at 653–654.

This Court sustained the Virginia statute. Viewing corporations as recipients of "special privileges," 8 Wall., at 181, and believing that "it might be of the highest public interest that the number of corporations in the State should be limited," *id.*, at 182, the Court held that a State's assent to the creation of a domestic corporation or the entry of a foreign corporation "may be granted upon such terms and conditions as those States may think proper to impose." *Id.*, at 181.[10] Under this view, there was no need for the Court to consider whether the statute was arbitrary, irrational, or discriminatory.

> "[The States] may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion." *Ibid.*

In two important respects, the legal underpinnings of *Paul* v. *Virginia* were soon eroded. First, the advent of laws of general incorporation, which swept the country in the late 19th century, see *Louis K. Liggett Co.* v. *Lee*, 288 U. S. 517, 557–564 (1933) (Brandeis, J., dissenting), altered the very nature of the corporation. Such laws, stimulated largely by "the desire for equality and the dread of special privilege[s]," *id.*, at 549, n. 4, permitted persons to form corporations freely, subject only to generally applicable requirements and limitations. Incorporation lost its status as a special privilege. See

---

[10] This view of the corporation reflected the common understanding through the first three-quarters of the 19th century. As Justice Brandeis has noted, "at first, the corporate privilege was granted sparingly; and only when the grant seemed necessary in order to procure for the community some specific benefit otherwise unavailable." *Louis K. Liggett Co.* v. *Lee*, 288 U. S. 517, 549 (1933) (dissenting opinion). See also 1 W. Fletcher, Cyclopedia of the Law of Private Corporations 5–6 (1974); G. Henderson, The Position of Foreign Corporations in American Constitutional Law 64–68 (1918) (hereafter Henderson).

Henderson 68.[11]   Second, the Fourteenth Amendment, ratified in 1868, introduced the constitutional requirement of equal protection, prohibiting the States from acting arbitrarily or treating similarly situated persons differently, *even with respect to privileges formerly dispensed at the State's discretion.*   The combination of general incorporation laws and equal protection necessarily undermined the doctrine of *Paul* v. *Virginia.*   If the right to incorporate or to do business within a State ceases to be a privilege to be dispensed by the State as it sees fit, and becomes a right generally available to all on equal terms, then the argument for special exactions as "privilege taxes" is destroyed.

The Court was slow to recognize the consequences of these developments.   In *Philadelphia Fire Assn.* v. *New York,* 119 U. S. 110 (1886), the first relevant decision governed by the Fourteenth Amendment, the Court unhesitatingly applied the doctrine of *Paul* v. *Virginia* to sustain a New York retaliatory insurance tax against an equal protection challenge. The Court held that a corporation is not a "person within [the State's] jurisdiction," 119 U. S., at 116, for purposes of the Equal Protection Clause unless it is in compliance with the conditions placed upon its entry into the State, and that a corporation assents to all state laws in effect at the time of its entry.   *Id.,* at 119.[12]

"The State, having the power to exclude entirely, has

---

[11] In 1869, the year *Paul* v. *Virginia* was decided, the Commonwealth of Virginia did not permit general incorporation of insurance companies. Va. Code of 1860, ch. 65, § 4.   Thus, the Court's conception of the corporate franchise in that case as a "grant of special privileges to the corporators," *Paul* v. *Virginia,* 8 Wall., at 181, was an accurate portrayal of the corporation as it existed at that time.   This was not to last for long. See Act of Mar. 30, 1871, 1870 Va. Acts, ch. 277 (general incorporation law made applicable to insurance companies).

[12] As appellee concedes, the theory espoused in *Philadelphia Fire Assn.* that a foreign corporation is not "a person within [the State's] jurisdiction" within the meaning of the Equal Protection Clause unless it is

the power to change the conditions of admission at any time, for the future, and to impose as a condition the payment of a new tax, or a further tax, as a license fee. If it imposes such license fee as a prerequisite for the future, the foreign corporation, until it pays such license fee, is not admitted within the State or within its jurisdiction. It is outside, at the threshold, seeking admission, with consent not yet given. . . . By going into the State of New York in 1872, [the Philadelphia Fire Association] assented to such prerequisite as a condition of its admission within the jurisdiction of New York." *Id.*, at 119–120.

Justice Harlan dissented. Acknowledging that a State may prescribe certain conditions upon the entry of a foreign corporation, he insisted "that it is the settled doctrine of this court, that the terms and conditions so prescribed must not be repugnant to the Constitution of the United States, or inconsistent with any right granted or secured by that instrument." *Id.*, at 125. "Can it be," he asked, "that a corporation is estopped to claim the benefit of the constitutional provision securing to it the equal protection of the laws simply because it voluntarily entered and remained in a State which has enacted a statute denying such protection to it and to like corporations from the same State?" *Id.*, at 127.

Although dicta in several cases supported Justice Harlan's view that a State may not impose conditions repugnant to the Constitution upon the grant of a privilege, see, *e. g., Ducat* v. *Chicago,* 10 Wall. 410, 415 (1871); *Doyle* v. *Continental*

---

in compliance with all conditions imposed on its entry is now discarded. See *Kentucky Finance Corp.* v. *Paramount Auto Exchange Corp.*, 262 U. S. 544, 549–551 (1923) (holding that a foreign corporation is "within" the State if it files a lawsuit therein); *Bethlehem Motors Corp.* v. *Flynt,* 256 U. S. 421, 424 (1921) (holding that "corporations doing business in a State and having an agent there are within the jurisdiction of the State").

*Ins. Co.,* 94 U. S., at 540, the Court continued to reject constitutional claims by corporations challenging conditions to entry. *E. g., New York* v. *Roberts,* 171 U. S. 658, 665–666 (1898); *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305, 312–315 (1892); *Pembina Consol. Silver Mining & Milling Co.* v. *Pennsylvania,* 125 U. S. 181, 184–185 (1888). Nonetheless, the first quarter of this century saw "an almost complete disintegration" of the doctrine of *Paul* v. *Virginia.* Henderson 111. The change became evident in the October Term 1909, when the Court decided four cases in conflict with the principle that the States possess unlimited power to condition the entry of foreign corporations.[13] The most significant of these decisions for our purposes is *Southern R. Co.* v. *Greene,* 216 U. S. 400 (1910), which expressly rejected the contention "that the imposition of special taxes upon foreign corporations for the privilege of doing business within the State is sufficient to justify such different taxation." *Id.,* at 417.[14]

---

[13] *Southern R. Co.* v. *Greene,* 216 U. S. 400 (1910); *Ludwig* v. *Western Union Telegraph Co.,* 216 U. S. 146 (1910); *Pullman Co.* v. *Kansas,* 216 U. S. 56 (1910); *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1 (1910) (*Western Union I*).

[14] *Southern R. Co.* relied on two Commerce Clause cases decided earlier in the same Term, in both of which Justice Harlan wrote the plurality opinion. *Western Union I, supra,* and *Pullman Co.* v. *Kansas, supra,* struck down Kansas taxes imposed on the total authorized capital of out-of-state corporations, representing the corporations' property both within and without Kansas. The State defended the taxes on the strength of *Paul* v. *Virginia* and like cases, as conditions imposed on the privilege of doing business within the State. The plurality held that a State may not impose unconstitutional conditions on the privilege of doing business within the State. See 216 U. S., at 33–38, 46–48; *Pullman Co.* v. *Kansas, supra,* at 62–63. Accord, *Ludwig* v. *Western Union Telegraph Co., supra.* Since a tax imposed on the out-of-state operations of an interstate company violates the Commerce Clause, see 216 U. S., at 38–45, such a tax may not be imposed as a prerequisite to doing business in the State. The plurality opinion distinguished *Paul* v. *Virginia* as involving the business of insur-

The plaintiff, Southern Railway, had been admitted to do business in Alabama and had invested in permanent facilities in the State. At that time, franchise taxes imposed on domestic corporations were equal to privilege taxes imposed on foreign corporations. Later, Alabama imposed an additional privilege tax on foreign corporations, which Southern Railway challenged on equal protection grounds. The Court held that classifications among corporations for purposes of taxation are constitutional under the Equal Protection Clause only if they bear a "reasonable and just relation" to the purpose for which they are imposed. *Ibid.* Noting that there were domestic corporations in Alabama whose business was indistinguishable from that of Southern Railway, the Court stated that "[i]t would be a fanciful distinction to say that there is any real difference in the burden imposed because the one is taxed for the privilege of a foreign corporation to do business in the State and [the] other for the right to be a corporation." *Id.*, at 417–418. The Court held that "to tax the foreign corporation for carrying on business under the circumstances shown, by a different and much more onerous rule than is used in taxing domestic corporations for the same privilege, is a denial of the equal protection of the laws." *Id.*, at 418.[15]

---

ance, which was not considered interstate commerce. 216 U. S., at 33–34. Although modified in detail, the principle established in these cases still governs Commerce Clause challenges to state privilege taxes. See *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977).

Justice Holmes, in dissent in both cases, pointed out that if a State has an "absolute arbitrary power" to exclude foreign corporations, then no conditions imposed on corporations in the exercise of that power could be unconstitutional. 216 U. S., at 54.

[15] *Southern R. Co.* did not, however, overrule *Philadelphia Fire Assn.* v. *New York* and like cases. Although acknowledging the difference in principle between its decision and that in *Philadelphia Fire Assn.,* 216 U. S., at 416, *Southern R. Co.* distinguished the earlier case on the ground that the Philadelphia Fire Association, unlike the Southern Railway, held only a one-year license renewable at the State's discretion.

In *Hanover Fire Ins. Co.* v. *Harding*, 272 U. S. 494 (1926), the Court extended the protections of *Southern Railway* against discriminatory taxation to corporations holding short-term licenses, and to those without substantial permanent property in the State.[16]   272 U. S., at 508, 509, 514–515. With respect to the general tax burden on business, "the foreign corporation stands equal, and is to be classified with domestic corporations of the same kind."   *Id.*, at 511.[17]

After *Hanover Fire Ins. Co.*, little was left of the doctrine of *Paul* v. *Virginia* and *Philadelphia Fire Assn.* v. *New York*, 119 U. S. 110 (1886).   It was replaced by a new doctrine:

"It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose.   But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights.   If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all.   It is inconceivable that guaranties embedded in the Constitution of the United States may

[16] This effectively overruled those portions of *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68, 88 (1913), overruled on other grounds, *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203, 218 (1925), and *Cheney Bros. Co.* v. *Massachusetts,* 246 U. S. 147, 156–158 (1918), that appeared to limit *Southern R. Co.* to cases in which the foreign corporation held substantial permanent property within the State.

[17] *Hanover Fire Ins. Co.* also held that, with respect to an admission fee charged to the corporation prior to its entry into the State, "the measure of the burden is in the discretion of the State, and any inequality as between the foreign corporation and the domestic corporation in that regard does not come within the inhibition of the Fourteenth Amendment." 272 U. S., at 511.   The opinion makes clear, however, that a tax on the business of the corporation after its admission may not be imposed in the guise of an admission fee.   *Ibid.*

thus be manipulated out of existence." *Frost & Frost Trucking Co.* v. *Railroad Comm'n,* 271 U. S., at 593–594. See also *Power Manufacturing Co.* v. *Saunders,* 274 U. S. 490, 497 (1927).

The decision in *Lincoln National Life Ins. Co.* v. *Read,* 325 U. S. 673 (1945), thus stands as a surprising throwback to the doctrine of *Paul* v. *Virginia* and *Philadelphia Fire Assn.* v. *New York.* There, the Court seemed to adopt precisely the argument that was rejected in *Hanover Fire Ins. Co.:* "that a State may discriminate against foreign corporations by admitting them under more onerous conditions than it exacts from domestic companies . . . ." 325 U. S., at 677; cf. 272 U. S., at 507.[18] The Court stated that the argument that a State may not impose unconstitutional conditions to entry "proves too much." 325 U. S., at 677. "If it were adopted," the Court said, "then the long-established rule that a State may discriminate against foreign corporations by admitting them under more onerous conditions than it exacts from domestic companies would go into the discard." *Ibid.*[19] So long as a tax is "levied upon the privilege of entering the State and engaging in business there," it may not be challenged under the Equal Protection Clause, even though it may impose a burden greater and more discriminatory than was imposed at the date of the corporation's entry into the State. *Id.,* at 678.

The holding in *Lincoln National* has been implicitly re-

---

[18] The Court in *Lincoln National Life Ins. Co.* v. *Read* erroneously distinguished *Hanover Fire Ins. Co.* as involving an out-of-state insurance company holding an "unequivocal" license rather than an annual license, renewable only upon satisfaction of the condition precedent of paying the discriminatory tax. 325 U. S., at 676. In fact, the Hanover Fire Insurance Co. held only an annual license. 272 U. S., at 509. The Court in *Hanover Fire Ins. Co.* explicitly stated that the "principle is the same," no matter whether the license is annual or indefinite. *Ibid.*

[19] The reasoning in *Lincoln National Life* was virtually identical to that offered by Justice Holmes in his *Western Union* dissent. See n. 14, *supra.*

jected in at least three subsequent cases. In *Wheeling Steel Corp.* v. *Glander*, 337 U. S. 562 (1949), the Court struck down a provision of Ohio's ad valorem tax law that subjected certain intangible property of non-Ohio corporations to a tax not applied to identical property of Ohio corporations. The Court concluded that the provision violated the Equal Protection Clause on the ground that the inequality of treatment was "not because of the slightest difference in Ohio's relation to the decisive transaction, but solely because of the different residence of the owner." *Id.*, at 572.[20] The decision in *Wheeling Steel* was not directly in conflict with that in *Lincoln National,* because the Ohio courts had held the tax in *Wheeling Steel* an "*ad valorem* property tax, . . . and in no sense a franchise, privilege, occupation, or income tax." 337 U. S., at 572. However, the *Wheeling Steel* decision rejected the *principle* of *Lincoln National:* the opinion declared that a State's power to exclude out-of-state corporations is limited by the Constitution; the State may not "exac[t] surrender of rights derived from the Constitution of the United States." 337 U. S., at 571 (citing *Hanover Fire Ins. Co.* v. *Harding, supra,* at 507).

In *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S. 522 (1959), this Court sustained an Ohio statute exempting non-residents from an ad valorem tax on certain property held in a storage warehouse, but not exempting Ohio residents from the tax. Without alluding to any possibility that legislative classifications based on State of incorporation should be subject to a different standard from other classifications, the Court held that state tax laws "must proceed upon a rational

---

[20] The State argued that other States could enact similar provisions, and thereby eliminate any inequality. This Court concluded, however, that "[i]t is hard to see that this offer of reciprocity restores to appellants any of the equality which the application of the Ohio tax, considered alone, so obviously denies." 337 U. S., at 573.

basis and may not resort to a classification that is palpably arbitrary." *Id.*, at 527.[21]

Finally, in *WHYY, Inc.* v. *Glassboro*, 393 U. S. 117 (1968), this Court struck down a New Jersey statute exempting nonprofit corporations incorporated in New Jersey from tax, but denying a similar exemption to nonprofit corporations incorporated in other States. Disregarding *Lincoln National*, the Court stated the applicable principle of law as follows:

> "This Court has consistently held that while a State may impose conditions on the entry of foreign corporations to do business in the State, once it has permitted them to enter, 'the adopted corporations are entitled to equal protection with the state's own corporate progeny, at least to the extent that their property is entitled to an equally favorable *ad valorem* tax basis.' *Wheeling Steel Corp.* v. *Glander*, 337 U. S. 562, 571–572. See *Reserve Life Ins. Co.* v. *Bowers*, 380 U. S. 258; *Hanover Fire Ins. Co.* v. *Harding*, 272 U. S. 494; *Southern R. Co.* v. *Greene*, 216 U. S. 400." 393 U. S., at 119–120.

In view of the decisions of this Court both before and after *Lincoln National*, it is difficult to view that decision as other than an anachronism. We consider it now established that, whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that

---

[21] Justice Harlan and I, concurring, went still further. Arguing that the Equal Protection Clause must be used as "an instrument of federalism," 358 U. S., at 532, we rejected the Court's analysis as insufficiently protective of out-of-state interests. We stated that the Equal Protection Clause denies a State "the power constitutionally to discriminate in favor of its own residents against the residents of other state members of our federation." *Id.*, at 533. Our position has not been adopted by the Court, which has subsequently required no more than a rational basis for discrimination by States against out-of-state interests in the context of equal protection litigation. *E. g., Baldwin* v. *Montana Fish and Game Comm'n*, 436 U. S. 371, 388–391 (1978); *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 810–814 (1976).

authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose. As we held in *Power Manufacturing Co.* v. *Saunders,* 274 U. S., at 493–494:

> "No doubt there are . . . subjects as to which foreign corporations may be classified separately from both individuals and domestic corporations and dealt with differently. But there are other subjects as to which such a course is not admissible, the distinguishing principle being that classification must rest on differences pertinent to the subject in respect of which the classification is made."

## IV

In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, we must answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose? See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S., at 461–463; *Vance* v. *Bradley,* 440 U. S. 93, 97–98 (1979).

The legislative purpose of California's retaliatory tax is not difficult to discern, for such taxes have been a common feature of insurance taxation for over a century. Although variously expressed, the principal purpose of retaliatory tax laws is to promote the interstate business of domestic insurers by deterring other States from enacting discriminatory or excessive taxes. A survey of state retaliatory tax laws summarized:

> "[W]hatever their character, it is obvious . . . that their ultimate object is not to punish foreign corporations doing business in the state, or retort the action of the foreign state in placing upon corporations of the enact-

ing state doing business therein burdens heavier than those imposed upon corporations of such foreign state doing business in the enacting state, but to induce such foreign state to show the same consideration to corporations of the enacting state doing business therein as is shown to corporations of such foreign state doing business in the enacting state." Annot., 91 A. L. R. 795 (1934).

Accord, *Bankers Life Co.* v. *Richardson*, 192 Cal. 113, 124–125, 218· P. 586, 591 (1923); *State ex rel. Crittenberger* v. *Continental Ins. Co.*, 67 Ind. App. 536, 542, 116 N. E. 929, 936 (1917); *Phoenix Ins. Co.* v. *Welch*, 29 Kan. 672, 674–675 (1883); *Life & Cas. Ins. Co.* v. *Coleman*, 233 Ky. 350, 351–352, 25 S. W. 2d 748, 749–750 (1930); *State* v. *Ins. Co. of North America*, 71 Neb. 320, 324, 99 N. W. 36, 38 (1904); *Massachusetts Mut. Ins. Co.* v. *Knowlton*, 94 N. H. 409, 412, 54 A. 2d 163, 165 (1947); *Commonwealth* v. *Fireman's Fund Ins. Co.*, 369 Pa. 560, 565–566, 87 A. 2d 255, 258 (1952); *Pacific Mut. Life Ins. Co.* v. *State*, 161 Wash. 135, 137–138, 296 P. 813, 814–815 (1931).[22]

California's retaliatory tax is based upon a model statute drafted by the insurance industry, and is virtually identical to that enacted by many other States. 4 California Assembly Interim Committee on Revenue and Taxation, The Insurance Tax, No. 15, pp. 64, 66 (1964) (hereafter Insurance Tax). Since the amount of revenue raised by the retaliatory tax is relatively modest, *id.*, at 65, and the impetus for passage of the tax comes from the nationwide insurance industry, it is clear that the purpose is not to generate revenue at the expense of out-of-state insurers, but to apply pressure on other

---

[22] Although the retaliatory tax is an imposition on interstate insurance companies, it is supported by the industry as a means of fostering uniform and moderate levels of taxation nationwide. See Brief for the American Insurance Association et al. as *Amici Curiae;* Council of State Governments, State Retaliatory Taxation of the Insurance Industry 12 (1977).

States to maintain low taxes on California insurers. As a committee of the California Assembly has said: "The actual rationale for the provision is that the application of the retaliatory laws acts as a deterrent to state taxation on the insurance industry." *Id.*, at 66.[23]

Decisions by the California courts lend weight to this analysis. The Court of Appeal in the instant case held that the purpose of the retaliatory tax "is to put pressure on the several states to impose the same tax burden on all insurance companies, foreign or domestic, and thereby encourage the doing of interstate business." 99 Cal. App. 3d, at 413, 159 Cal. Rptr., at 541. Accord, *Western & Southern Life Ins. Co.* v. *State Board of Equalization,* 4 Cal. App. 3d, at 34, 84 Cal. Rptr., at 96; *Atlantic Ins. Co.* v. *State Board of Equalization,* 255 Cal. App. 2d 1, 4, 62 Cal. Rptr. 784, 786 (1967), cert. denied and appeal dism'd, 390 U. S. 529 (1968).

Many may doubt the wisdom of California's retaliatory tax; indeed, the retaliatory tax has often been criticized as a distortion of the tax system and an impediment to the raising of revenue from the taxation of insurance. See, *e. g.,* Council of State Governments, State Retaliatory Taxation of the Insurance Industry 12–13 (1977); Task Force Report, Statement of Policy on Insurance Premium Taxation, 1 Proc. Nat. Assn. of Ins. Comm'rs 71 (1971); Report of New Jersey Tax Policy Comm., Pt. V, pp. 47–48 (1972); Strickler, The Mess in State Premium Taxation of Insurance Companies, 69 Best's Rev. 34, 38 (1969). But the courts are not empowered to second-guess the wisdom of state policies. *Ferguson* v. *Skrupa,* 372 U. S. 726, 729 (1963). Our review is confined to the *legitimacy* of the purpose.

---

[23] The nature of the classification supports this conclusion as well. The retaliatory tax is not imposed on foreign corporations *qua* foreign corporations, as would be expected were the purpose of the tax to raise revenue from noncitizens; rather, it is imposed only on corporations whose home States impose more onerous burdens on California insurers than California otherwise would impose on those corporations.

There can be no doubt that promotion of domestic industry by deterring barriers to interstate business is a legitimate state purpose. This Court has recognized the legitimacy of state efforts to maintain the profit level of a domestic industry, *Parker* v. *Brown,* 317 U. S. 341, 363–367 (1943), and of efforts to "protect and enhance the reputation" of a domestic industry so that it might compete more effectively in the interstate market, *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 143 (1970). California's effort on behalf of its domestic insurance industry is no less legitimate.

The mere fact that California seeks to promote its insurance industry by influencing the policies of other States does not render the purpose illegitimate. As we said in *United States Steel Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452, 478 (1978):

> "Any time a State adopts a fiscal or administrative policy that affects the programs of a sister State, pressure to modify those programs may result. Unless that pressure transgresses the bounds of the Commerce Clause or the Privileges and Immunities Clause of Art. IV, § 2, see, *e. g., Austin* v. *New Hampshire,* 420 U. S. 656 (1975), it is not clear how our federal structure is implicated."

Having established that the purpose of California's lawmakers in enacting the retaliatory tax was legitimate, we turn to the second element in our analysis: whether it was reasonable for California's lawmakers to believe that use of the challenged classification would promote that purpose. We acknowledge at the outset that many persons believe that retaliatory taxes are not an effective means for accomplishment of the goal of deterring discriminatory and excessive taxation of insurance companies by the various States. See, *e. g.,* Bodily, The Effects of Retaliation on the State Taxation of Life Insurers, 44 J. of Risk & Ins. 21 (1977); Pelletier, Insurance Retaliatory Laws, 39 Notre Dame Law. 243, 268–269 (1964); Task Force Report, *supra,* at 71. But whether

*in fact* the provision will accomplish its objectives is not the question: the Equal Protection Clause is satisfied if we conclude that the California Legislature *rationally could have believed* that the retaliatory tax would promote its objective. *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S., at 466; *Vance* v. *Bradley,* 440 U. S., at 111; *United States* v. *Carolene Products Co.,* 304 U. S. 144, 154 (1938).

The Interim Committee on Revenue and Taxation of the California Assembly conducted a major study of the State's tax system before recommending passage of a constitutional amendment permitting enforcement of the present retaliatory tax.[24] That study found:

> "It is true that insurers are disadvantaged by retaliatory taxation provisions in the short run, for they usually result in some insurers paying more in taxes in retaliating states. But, in the long run, insurers as a group pay less in taxes because of these provisions, since legislators, when considering measures affecting insurers, do consider retaliatory effects in instance after instance." Insurance Tax, at 66.

The study concluded that retaliatory taxes "have kept premiums lower and insurers' profits higher than would otherwise have been the case." *Id.,* at 67. It therefore recommended passage of the proposed constitutional amendment. See *ibid.*

We cannot say that the California Legislature's conclusions were irrational, or even unreasonable. Assuming that the lawmakers of each State are motivated in part by a desire to promote the interests of their domestic insurance industry, it is reasonable to suppose that California's retaliatory tax will induce other States to lower the burdens on California insurers in order to spare their domestic insurers the cost of the retaliatory tax in California.

---

[24] See n. 1, *supra.*

In any event, we do not find the evidence against the retaliatory tax overwhelming. The California Department of Finance evaluated the effect of the retaliatory laws:

"Whether the insurance companies have sponsored this legislation or not, in their resistance to tax change they have benefitted by it. The home-owned companies in all but a half dozen states are able to say, 'Don't raise our taxes. If you do, we will have to pay more in other states.' The effectiveness of this barrier is demonstrated by the fact that of the 48 states, only 9 increased their insurance tax rates in the last twelve years. . . . None of these is an outstanding insurance state." State Department of Finance, Budget Div., Highlights of Proposal for Quarterly Insurance Tax Payments 3 (1963).

The California courts examined the issue, and found:

"The common purpose of [retaliatory tax] legislation in the several states has been to discourage any state from imposing discriminatory taxes or other burdens upon out-of-state companies. The effort seems to have been very largely successful; in any event taxes on insurance premiums have stayed close to 2 percent in most states, for both domestic and out-of-state insurers." *Atlantic Ins. Co.* v. *State Board of Equalization*, 255 Cal. App. 2d, at 4, 62 Cal. Rptr., at 786.

Authorities in the field have found the evidence mixed. The leading empirical study of the effect of retaliatory tax laws examined tax rates on life insurance premiums from 1935 through 1972, and found: (1) that tax rates have not increased significantly in absolute terms over the period; (2) that life insurance premiums taxes have declined as a percentage of total state tax revenues;[25] and (3) that dis-

---

[25] A large part of this decline may be accounted for by the general decline in the States' reliance on business taxes. From 1957 to 1972, the proportion of total state tax revenues attributable to general business

crimination against foreign insurance companies has declined over the period. Bodily, 44 J. of Risk & Ins., at 27–32. These results are precisely those that advocates of the retaliatory tax would predict, and thus provide some support for that theory. Statistical analysis of the available data, however, failed to verify this conclusion: the correlation between retaliatory tax laws and the observed results was not found to be statistically significant. *Id.*, at 30–31. The author therefore concluded that retaliatory taxes have been "of questionable value." *Id.*, at 34. Cf. Pelletier, 39 Notre Dame Law., at 267–269; Felton, Retaliatory Insurance Company Taxation: An Evaluation, 28 J. of Ins. 71, 77–78 (1961).

Parties challenging legislation under the Equal Protection Clause cannot prevail so long as "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable." *United States* v. *Carolene Products Co., supra,* at 154. On this standard, we cannot but conclude that the California retaliatory insurance tax withstands the strictures of the Fourteenth Amendment.

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

The practice of holding hostages to coerce another sovereign to change its policies is not new; nor, in my opinion, is it legitimate. California acknowledges that its discrimina-

---

taxes fell by 17.7%, while the proportion attributable to life insurance premiums taxes fell by 20.0%. Bodily, The Effects of Retaliation on the State Taxation of Life Insurers, 44 J. of Risk & Ins. 21, 31–32 (1977). But see State Department of Finance, Budget Div., Highlights of Proposal for Quarterly Insurance Tax Payments 3–4 (1963) (showing that since 1950, the proportion of California tax revenues attributable to insurance taxes has decreased substantially relative to that attributable to bank and corporate taxes).

tion against Ohio citizens within its jurisdiction is specifically intended to coerce the Ohio Legislature into enacting legislation favored by California. Today the Court holds that this state purpose is legitimate. In my opinion that coercive motivation is not an acceptable justification for California's discriminatory treatment of nonresidents.

The discrimination disclosed by this record is much more irregular than a simple preference for domestic corporations over foreign corporations. Some foreign insurance companies pay the same tax that domestic companies pay. Those that pay higher taxes than California companies do not all pay the same tax. Thus, for example, California taxes insurance companies incorporated in Ohio at a 2.5% rate, Montana companies at a 2.75% rate, and West Virginia and Idaho companies at a 3% rate.[1] The prevailing tax rate in California for domestic companies and most foreign companies is 2.35%.[2] Thus the insurance companies competing in the California market are subjected to flagrant discrimination.

A desire to eliminate discrimination in other States does not justify the discrimination practiced by California. All insurance companies that do business in Ohio are taxed at the 2.5% rate and all those that compete in the West Virginia market pay the 3% rate. Neither of those States has meddled in California's affairs or taken any action that has a special impact in California. California's justification for its retaliatory tax scheme is simply to apply pressure on other States to lower their tax rates to the level that California considers acceptable. The possibility that different States

---

[1] See Cal. Ins. Code Ann. § 685 (West 1972); Idaho Code § 41–402 (1977); Ohio Rev. Code Ann. § 5729.03 (1973); Mont. Code Ann. § 33-2–705 (1979); W. Va. Code §§ 33-3-14 and 33-3-14a (Supp. 1980). As the Court's opinion indicates, *ante,* at 651, the amount of retaliatory taxes reflected by these small percentage differences is significant.

[2] Cal. Rev. & Tax. Code Ann. §§ 12201, 12202 (West 1970).

may have different fiscal needs is a matter of no concern to California.[3]

Furthermore, the discrimination is not justified by any actions taken in California. The State has not pointed to any significant difference in the way different taxpayers conduct their business in California. No administrative problems justify charging residents of some States higher taxes than others. The mere difference in residence is admittedly an insufficient reason for disparate treatment,[4] and the incremental tax collected from out-of-state companies is not justified as a revenue measure.[5] Thus the retaliatory in-

---

[3] The United States, as *amicus curiae*, takes the position that California has no legitimate interest in Ohio's level of taxation or fiscal structure when no discriminatory action against California citizens or corporations is involved. It states:

"The several states have different resources, populations, social and economic conditions, levels of public service, fiscal structures, methods and sources of raising revenue, and tax burdens, both in gross and per capita. With respect to other states, where no discriminatory or hostile action is involved, the states are largely autonomous in these matters. And even if another state has engaged in discriminatory action, the Constitution, as this Court has pointed out, does not contemplate the economic warfare of reprisal and retaliation. *A&P Tea Co.* v. *Cottrell*, 424 U. S. 366 (1976)." Brief for United States as *Amicus Curiae* 10.

[4] As the Court states:

"We consider it now established that, whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." *Ante*, at 667–668.

See also *Wheeling Steel Corp.* v. *Glander*, 337 U. S. 562, 572:

"It seems obvious that appellants are not accorded equal treatment, and the inequality is not because of the slightest difference in Ohio's relation to the decisive transaction, but solely because of the different residence of the owner."

[5] "[I]t is clear that the purpose is not to generate revenue at the expense

crement is in the nature of a monetary penalty imposed on foreign citizens to apply pressure to their sovereign. Analytically, pressure of that kind is comparable to ransom.[6]

The Fourteenth Amendment to the United States Constitution provides that no State may "deny to any person within its jurisdiction the equal protection of the laws." The federal interest vindicated by this provision requires every State to respect the individuality and the essential equality of every person subject to its jurisdiction; it forbids disparate treatment that is unrelated to any difference in the character or the behavior of persons subject to the State's jurisdiction. California's disapproval of the official policies of the State of Ohio cannot justify the exaction of special payments from individuals who come from that State, even though such exactions may cause them to plead with their legislature to conform to California's will.[7]

---

of out-of-state insurers, but to apply pressure on other States to maintain low taxes on California insurers." See *ante,* at 669–670.

[6] California's objective is to confer a limited benefit on a limited group of companies that are incorporated under its laws. This case involves the special interest of insurance companies in paying taxes at a rate no higher than the rate California requires for its budgetary purposes. The next case may involve a different industry with a different special interest. Thus, for example, the trucking industry or the motorcoach industry might favor high speed limits, loose safety inspection laws, and lax emission standards. If their lobbyists could persuade the legislature of a powerful State to adopt rules favorable to their interests, then under today's holding they may also seek retaliatory programs that would apply pressure to neighboring States to adopt similar rules. Although such a statute might violate other constitutional provisions, such as the Commerce Clause, under today's holding the Equal Protection Clause would present no impediment.

[7] In holding that California's purpose in enacting the discriminatory tax is legitimate, the Court compares this case to state attempts to maintain the profit level of a domestic industry, *Parker* v. *Brown,* 317 U. S. 341, 363–367, and efforts to "protect and enhance the reputation" of a domestic industry, enabling it to compete more effectively in the interstate market. *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 143. The enactment

In my opinion the federal interest in the impartial administration of the laws of the several States is unquestionably paramount to any one State's parochial interest in applying pressure to its neighbors by use of "retaliatory" legislation. This discriminatory legislation is not justified by a legitimate purpose and therefore violates the Equal Protection Clause.

I respectfully dissent.

---

of a statute designed to confer a direct benefit or to provide protection for domestic corporations is surely not comparable to California's imposition of a burden on foreign corporations designed to coerce foreign States to enact legislation which will benefit California corporations at the expense of the interest which motivated the foreign State's original tax rate.